NON-CONFIDENTIAL VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| SHRIMP COMMITTEE OF THE VIETNAM ASSOCIATION OF SEAFOOD EXPORTERS AND PRODUCERS, | : : : : : | |
| Plaintiff, | : : | |
| v. | : : | Court No. 25-00032 |
| UNITED STATES, | : : : | Non-Confidential Version |
| Defendant, | : : : : : | Business Proprietary Information removed from pages 9, 29, 53, and 56. |
| and | : : | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PRODUCERS ASSOCIATION, | : : : : | |
| Defendant-Intervenors. | : : | |

PLAINTIFF'S RULE 56.2 MOTION
FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the U.S. Court of International Trade,

Plaintiff Shrimp Committee of the Vietnam Association of Seafood

NON-CONFIDENTIAL VERSION

Exporters and Producers (Court No. 25-00032) hereby moves for judgment on the agency record with regard to the U.S. International Trade Commission's ("Commission") final affirmative determinations in *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, 89 Fed. Reg. 102,163 (Int'l Trade Com'n Dec. 17, 2024); *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, Inv. Nos. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024).[1]  The Commission made these determinations in the context of the antidumping duty investigation of frozen warmwater shrimp from Indonesia and countervailing duty investigations of frozen warmwater shrimp from Ecuador, India, and Vietnam.  For the reasons explained in the accompanying memorandum, Plaintiff respectfully moves the Court to hold that the Commission's determinations are neither supported by substantial evidence nor in accordance with law.  Plaintiff further moves

---

[1] The Court ordered that Vietnam Association of Seafood Exporters and Producers (Court No. 25-00032) and Indonesian Fishery Producers Processing and Marketing Association (Court No. 25-00035) submit a joint motion for judgment on the agency record.  *Scheduling Order*, ECF 35 at 3 (June 5, 2025).  However, the Indonesian Fishery Producers Processing and Marketing Association has since filed a stipulation of voluntary dismissal, and the Court dismissed Court No. 25-00035.  *Stipulation of Dismissal*, Court No. 25-00035 ECF 35 (Aug. 15, 2025).  Therefore, Vietnam Association of Seafood Exporters and Producers submits this motion and accompanying memorandum for Court No. 25-00032.

NON-CONFIDENTIAL VERSION

the Court to remand this matter to the Commission for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
Julia K. Eppard
Paul S. Bettencourt
AKIN GUMP STRAUSS
HAUER & FELD LLP
2001 K Street, NW
Washington, DC 20006

Dated:  August 22, 2025

*Counsel to Shrimp Committee of the Vietnam Association of Seafood Exporters and Producers*

NON-CONFIDENTIAL VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| SHRIMP COMMITTEE OF THE VIETNAM ASSOCIATION OF SEAFOOD EXPORTERS AND PRODUCERS, | : : : : : | |
| Plaintiff, | : : | |
| v. | : : | Court No. 25-00032 |
| UNITED STATES, | : : : | Non-Confidential Version |
| Defendant, | : : | Business Proprietary Information removed from pages 9, 29, 53, and 56. |
| and | : : : | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PRODUCERS ASSOCIATION, | : : : : | |
| Defendant-Intervenors. | : : | |

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
RULE 56.2 MOTION FOR JUDGMENT
ON THE AGENCY RECORD

NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

I.    Introduction.................................................................1

II.   Statement Pursuant to Rule 56.2(c)(1) ...........................2
      A.    Administrative Determinations Under Review .....................2
      B.    Issues of Law and Bases for Remanding the
            Commission's Determinations ................................3

III.  Statement of the Case ...........................................4
      A.    Statutory Framework ........................................4
      B.    Procedural History .........................................6
            1.    The Commission's Preliminary Determinations..........6
            2.    The Commission's Final Determinations ...............7

IV.   Subject Matter Jurisdiction and Standard of Review ..................14

A.    The Court Has Subject Matter Jurisdiction ....................14
      B.    Standard of Review .........................................14
            1.    The Commission Must Support its
                  Determinations with Substantial Evidence ..............14
            2.    The Commission's Determinations Must Be in
                  Accordance with Law ..................................18

V.    Summary of Argument...........................................23

VI.   The Commission's Final Determinations Are Not Supported
      by Substantial Evidence or Otherwise Not in Accordance
      with Law.........................................................24
      A.    The Commission's Pricing Analysis Was Unsupported
            by Substantial Evidence and Otherwise Not in
            Accordance with Law .........................................24
            1.    The Commission Improperly Found Underselling
                  Was Significant when the Domestic Industry's
                  Market Share Was Nearly Unchanged .....................27
            2.    The Commission's Analysis is Inconsistent with
                  Pricing Data on the Record...........................33
            3.    The Record Does Not Support a Finding of Price
                  Suppression ..........................................36

NON-CONFIDENTIAL VERSION

B.    The Commission's Determination of Negative Impact from the Subject Imports is Not Supported by Substantial Evidence and Not in Accordance with Law ...... 39

    1.    The Record Does Not Support the Commission's Finding that Subject Imports Caused a Significant Negative Impact on the Domestic Industry ....................................................................... 39

    2.    The Commission's Determinations Rely on an Unlawful Interpretation of "Material Injury" in the Statute .................................................................. 44

C.    The Commission Improperly Attributed Changes in the Domestic Industry's Performance to Subject Imports ......... 47

    1.    The Commission Ignored Record Evidence Demonstrating Attenuated Competition Between Farm-Raised and Wild-Caught Shrimp ...................... 49

    2.    The Commission Failed to Collect Questionnaire Response Data that Would Elicit Record Evidence of Alternative Causes of Decreased Domestic Industry Market Share ................................................ 60

VII.   Conclusion ...................................................................... 62

CONFIDENTIAL MATERIAL REMOVED

The material bracketed on page 9 indicates the extent to which subject import market share changed; the material bracketed on page 29 describes reported differences between the U.S. markets for fresh and frozen shrimp; the material bracketed on pages 53 describes U.S. purchaser questionnaire responses regarding the interchangeability of farm-raised and wild-caught shrimp; and the material bracketed in the footnote on page 56 identifies the name of a company that submitted a U.S. purchaser questionnaire response.

NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011) ..................................................... 15, 53, 57

*Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1369 (Fed. Cir. 2002) ............................................................................................18

*Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003) ............................................................................................37

*Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001) ...................................................................................................16

*Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) ..... 14, 16

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ...2, 45

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) ............................................................................37

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) 14

*Bando Chem. Indus., Ltd. v. United States*, 787 F. Supp. 224, 227 (Ct. Int'l Trade 1992) ........................................................................20

*Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ..................................18

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) ........35

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ..................................................... 19, 27, 45

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) ...................................................................................................17

*Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1088 (Ct. Int'l Trade 1988) ........................................................................21

*Coalition for Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 15 F Supp. 2d 918, 924-25 (Ct. Int'l Trade 1998) ......................................................................................... 24, 26

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) ......................................................................................... 14, 50, 58

*Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) ...................................................................................................... 15, 47, 57

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970) ................................................................................ 17, 22

i

*Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) ....................................................................... 16, 55, 58

*JMC Steel Group v. United States*, 24 F. Supp. 3d 1290, 1304 (Ct. Int'l Trade 2014) ...................................................................................16

*LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990) ............................................................................16

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ........ 2, 18, 19

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ................................................................................19

*Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608, 624 (Ct. Int'l Trade 1993) ....................................................... 15, 42, 57

*Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008) ................................................................................46

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ............................................................................20

*New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) .................................18

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) ...........................................................................................14

*Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003) ......46

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) ................................................................................... 21, 35

*OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ................................................................................................16

*Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1337 (Ct. Int'l Trade 2010) ....................................................................... 19, 46

*Royal Thai Gov't v. United States*, 502 F. Supp. 2d 1334, 1341 (Ct. Int'l Trade 2007) ....................................................................... 22, 36

*SCM Corp. v. United States*, 487 F. Supp. 96, 99 (Cust. Ct. 1980) ..........17

*Shandong Rongxin Import & Export Co., v. United States*, 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016 ................................ 15, 17, 42

*SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) . 22, 36

*Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) ................................................................................................20

*Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) . 22, 36

*Tropicana Prods., Inc. v. United States*, 484 F. Supp. 2d 1330, 1347 (Ct. Int'l Trade 2007) ...................................................................... 15, 20

*Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290, 1297 (Ct. Int'l Trade 2007) ...............................................21

*U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1356 (Fed. Cir. 1996)....18

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)............. 14, 61

*USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987) ...................................................................................................15

*Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998) ......................................................................................................1

*Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221, 1248 (Ct. Int'l Trade 2022) ................................................................16

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) ............................................................... 14, 38, 45

## STATUTES

(a)(2)(B)(i) ....................................................................................14

1671d(b) .......................................................................................14

1673d(b) .......................................................................................52

19 U.S.C. § 1516a(a)(2)(A)(i)(II) ..................................................14

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................. 15, 22

19 U.S.C. § 1671 et seq. .................................................................4

19 U.S.C. § 1673 *et seq.* ................................................................5

19 U.S.C. § 1677(7)(A) .............................................................5, 50

19 U.S.C. § 1677(7)(B)(i) ...............................................................5

19 U.S.C. § 1677(7)(C) ...................................................................6

19 U.S.C. § 1677(7)(C)(ii) ....................................................... 30, 31

19 U.S.C. § 1677(7)(C)(ii)(II) ......................................................31

19 U.S.C. § 1677(7)(C)(iii) ...........................................................47

19 U.S.C. § 1677f(i)(3)(b) .............................................................26

19 U.S.C. §§ 1671d(b) ...................................................................52

19 U.S.C. §§ 1673d(b) ...................................................................14

28 U.S.C. § 1581(c) .......................................................................14

## REGULATIONS

NON-CONFIDENTIAL VERSION

19 C.F.R. §§ 207.4(a), 207.15, 207.23, 207.25................................................4
19 C.F.R. § 207.15 .............................................................................................4
19 C.F.R. § 207.23 .............................................................................................4
19 C.F.R. § 207.25 .............................................................................................4

## ADMINISTRATIVE DECISIONS

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final), USITC Pub. 5560 at 74-75 (Nov. 2024).........................................................................47
*Forged Steel Fittings from India and Korea*, Inv. Nos. 701-TA-631 & 731-1463-1464 (Final), USITC Pub. 5137 at 30 (Nov. 2020) .......... 25, 27
*Stainless Steel Round Wire from Canada, India, Japan, Korea, Spain, Taiwan*, Inv. Nos. 731-TA-781-86 (Final), USITC Pub. 3194 at 14-15 (May 1999) ................................................................................... 25, 27

## LEGISLATION

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I at 851-52 (1994) ...........................................5

## GLOSSARY

POI.........................................................................Period of Investigation
COGS ......................................................................... Cost of Goods Sold
IQF.................................................................Individually Quick Frozen

I.    Introduction

In its determinations before the Court, the Commission found, through misapplication of the governing law and failure to account for key record evidence, that U.S. imports of frozen warmwater shrimp from Ecuador, India, Indonesia, and Vietnam are a cause of material injury to the domestic industry.  Had it properly followed the law and accorded the required consideration of evidence that contradicted its conclusions, it could not have reached the determinations that it did.

The Commission's reversible errors begin with its failure to conduct the required "reasoned analysis" in examining the supposed price effects of the subject imports.  *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).  The Commission's analysis further unreasonably obfuscated data underscoring strong financial and operational performance of the domestic industry relative to conditions of competition.

Then, in evaluating the impact of subject imports, the Commission not only failed to grapple with compelling evidence contradicting its findings but applied the statute so as to "render{} superfluous" a key parameter of its required impact analysis.  *Astoria Fed. Sav. & Loan*

NON-CONFIDENTIAL VERSION

*Ass'n v. Solimino*, 501 U.S. 104, 112 (1991).  The Court should ensure that the Commission reaches the best reading of the governing statute, giving full effect to each word in the statute.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024).  The impact analysis is also deficient because of the Commission's failure to adopt proposed comments on draft questionnaires that would have allowed the Commission to draw conclusions based on adequate record evidence.  Because of its failure to adequately develop the record, the Commission arbitrarily attributed injurious effects to subject imports without adequate consideration of alternative causes of material injury.

The Commission's findings in the contested determinations, in their totality, read the word "material" out of the statute.  The Commission's determinations cannot stand under the standard of review that the Court is directed, by statute and precedent, to apply.  The Court should remand for reconsideration.

## II.    Statement Pursuant to Rule 56.2(c)(1)

### A.    Administrative Determinations Under Review

Plaintiff seeks judicial review of the final affirmative injury determinations of the Commission in the antidumping duty investigation

of frozen warmwater shrimp from Indonesia and countervailing duty investigations of frozen warmwater shrimp from Ecuador, India, and Vietnam. *See Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, 89 Fed. Reg. 102,163 (Int'l Trade Comm'n Dec. 17, 2024); *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, Inv. Nos. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024).

B.    Issues of Law and Bases for Remanding the Commission's Determinations

1.    Whether the relevant law and substantial evidence support the Commission's conclusion that underselling caused significant changes to the domestic industry's market share.

2.    Whether the relevant law and substantial evidence support the Commission's determination that the domestic industry experienced a significant negative impact from subject imports, despite several factors indicating that the domestic industry's performance improved or was unchanged relative to demand during the POI.

3.    Whether the relevant law and substantial evidence support the Commission's decision to attribute any material injury experienced

NON-CONFIDENTIAL VERSION

by the domestic industry to subject imports instead of the domestic industry's documented supply constraints or attenuated competition between the foreign and domestic industries.

Because neither substantial evidence nor the law support these decisions made by the Commission, the Court should remand and order the Commission to reconsider them.

III.   Statement of the Case

A.   Statutory Framework

Under the relevant provisions of the Tariff Act of 1930, as amended, any order imposing antidumping or countervailing duties requires two underlying predicates: (1) a final affirmative determination by the U.S. Department of Commerce ("Commerce") of a countervailable subsidy or sales at less than fair value; and (2) a final affirmative determination of material injury or threat thereof from subject imports by the Commission.   *See* 19 U.S.C. § 1671(a) et seq. (countervailing duties); 19 U.S.C. § 1673 *et seq.* (antidumping duties).

The record upon which the Commission conducts its injury investigation comprises "{a}ll material properly filed," including briefs and supporting exhibits filed by interested parties. 19 C.F.R. §§ 207.4(a),

NON-CONFIDENTIAL VERSION

207.15, 207.23, 207.25.   As defined in the statute, "material injury" is "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A).   To assess whether an industry in the United States ("domestic industry") is experiencing or threatened with material injury by reason of subject imports, the Commission must consider: the "volume" of subject imports; any effects subject imports have on "prices in the United States for domestic like products"; the "impact" of subject imports on domestic producers; and any other "economic factors" that are "relevant."   19 U.S.C. § 1677(7)(B)(i).   Throughout its analysis, the Commission must "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C).   As made clear by the legislative history, the Commission's duty to assess whether any injury is "by reason of" subject imports also requires that it "examine other factors to ensure that it is not attributing injury from other sources to the subject imports." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I at 851-52 (1994).

NON-CONFIDENTIAL VERSION

B.    Procedural History

1.    The Commission's Preliminary Determinations

On October 25, 2023, the American Shrimp Processors Association filed petitions with the Commission and Commerce alleging that an industry in the United States was materially injured or threatened with material injury by reason of subsidized imports of frozen warmwater shrimp from Ecuador, India, Indonesia, and Vietnam and imports of frozen warmwater shrimp from Ecuador and Indonesia sold at less than fair value ("subject imports"). *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 74,511 (Oct. 31, 2023).

On December 14, 2023, the Commission published notice of its preliminary affirmative determinations of a reasonable indication of material injury by reason of subject imports. *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, 88 Fed. Reg. 86,677 (Dec. 14, 2023).

NON-CONFIDENTIAL VERSION

2.    The Commission's Final Determinations

On January 26, 2024, the Commission released draft questionnaires for interested parties to submit comments on revisions to collect data relevant to these investigations.  Plaintiff and other parties submitted comments on March 4, 2024.

On June 26, 2024, the Commission published notice, instituting its final investigations.  *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam; Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 89 Fed. Reg. 53,444 (June 26, 2024); *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam; Revised Schedule for the Subject Investigations*, 89 Fed. Reg. 80,604 (Oct. 3, 2024) (amending the schedule to accommodate Commerce's tolling of statutory deadlines in its investigations).

Along with other interested parties, Plaintiff submitted a prehearing brief on October 15, 2024, gave testimony at the Commission's October 22, 2024 hearing, filed a posthearing brief on October 29, 2024, and filed final comments on November 14, 2024.

On December 17, 2024, the Commission published notice of affirmative determinations that a domestic industry was materially

injured by reason of subject imports. *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, 89 Fed. Reg. 102,163 (Dec. 17, 2024); *Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. Nos. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024). The Commission found that the volume of subject imports was significant, and that such imports caused significant price effects and had a significant impact on the domestic industry. *See Confidential Opinion* at 37-91, Appx1299-1353; USITC Pub. 5566 at 37-90.

With respect to volume effects, the volume of cumulated subject imports declined from 2021 to 2023 but was higher between the interim periods (January-March 2023 and January-March 2024). *Confidential Opinion* at 53, Appx1315; USITC Pub. 5566 at 53. Cumulated subject imports as a share of apparent U.S. consumption increased from 2021 to 2023 and between in interim 2024 and interim 2023. *Confidential Opinion* at 53, Appx1315; USITC Pub. 5566 at 53. The Commission also considered the ratio of cumulated subject imports to domestic production. *Confidential Opinion* at 53, Appx1315; USITC Pub. 5566 at 53. Based on this record, the Commission found that the volume of cumulated subject

imports was significant in absolute terms and relative to production and consumption in the United States. *Confidential Opinion* at 54, Appx1316; USITC Pub. 5566 at 54.

With respect to price effects, the Commission found that there was "at least a moderate degree of substitutability" between cumulated subject imports and the domestic like product and that "price is an important factor in purchasing decisions, <u>among other important factors</u>." *Confidential Opinion* at 54, Appx1316; USITC Pub. 5566 at 54 (emphasis added). The Commission found underselling (65.9 percent) and overselling (34.1 percent) by cumulated subject imports. *Confidential Opinion* at 55, Appx1317; USITC Pub. 5566 at 55. The Commission reported anecdotal evidence of marketing campaigns (news articles and testimony regarding imported product being offered at regional festivals in the South), <u>suggesting</u> that "U.S. consumers are largely unaware of whether they are buying domestically produced wild-caught shrimp or imported farm-raised shrimp, and thus are not in a position to offer a premium for wild-caught shrimp." *Confidential Opinion* at 61, Appx1323; USITC Pub. 5566 at 61.

NON-CONFIDENTIAL VERSION

Based on these observations, the Commission concluded that "cumulated subject imports significantly undersold the domestic like product during the {period of investigation ("POI")}. The underselling led to significant lost sales by the domestic industry and a shift in market share from the domestic industry to cumulated subject imports between 2021 and 2023." *Confidential Opinion* at 58, Appx1320; USITC Pub. 5566 at 58. Further, "subject imports gained **[ ]** percentage points of market share between 2021 and 2023, partially at the expense of the domestic industry, which lost 0.8 percentage points of market share to subject imports over the period." *Confidential Opinion* at 58, Appx1320.

The Commission also found that prices generally declined over the POI, as apparent U.S. consumption declined, which the Commission claimed evidenced price depression. *Id.* at 64-66, Appx1326-1328; USITC Pub. 5566 at 63-66. The Commission reported that the domestic industry's ratio of cost of goods sold ("COGS") to net sales declined over the POI but made no findings regarding price suppression. *Confidential Opinion* at 67, Appx1327; USITC Pub. 5566 at 66-67.

The Commission did not agree with respondents' arguments regarding the lack of negative price effects by cumulated subject imports.

In particular, the Commission found that competition between cumulated subject imports and the domestic product was not attenuated "by virtue of almost all subject imports being farm-raised and almost all domestically produced frozen warmwater shrimp being wild-caught." *Confidential Opinion* at 58, Appx1320; USITC Pub. 5566 at 58.  The Commission acknowledged that "some responding purchasers and importers reported that wild-caught and farm-raised shrimp have limited interchangeability, including a majority of responding U.S. importers reporting that they are never interchangeable, while a majority of responding U.S. processors reported that farm-raised and wild-caught warmwater shrimp are always interchangeable." *Confidential Opinion* at 58-59, Appx1320-1321; USITC Pub. 5566 at 58-59.  The Commission nonetheless concluded that

> the record indicates that frozen warmwater shrimp is frequently marketed and sold in ways that downplay the distinctions between domestic wild-caught shrimp and imported farm-raised shrimp, which inhibits purchasing decisions on that basis and elevates distinctions in prices. That retailers and consumers often do not know whether they have purchased wild-caught shrimp or farm-raised shrimp, and simply request shrimp without regard to its origin, indicates that there is interchangeability between the two. As previously discussed, a majority of responding purchasers reported that they and their customers never or only

sometimes make purchasing decision based on the country of origin.

*Confidential Opinion* at 59, Appx1321; USITC Pub. 5566 at 59 (footnotes omitted).

With respect to the impact of cumulated subject imports on the domestic industry, the Commission evaluated factors relating to output, employment, and financial performance and examined the domestic industry's performance separately for U.S. processors and U.S. fishermen. *Confidential Opinion* at 70, Appx1332; USITC Pub. 5566 at 70. In summary, the Commission found that

> the significant volume of cumulated subject imports significantly undersold the domestic like product during the POI. This caused the domestic industry to lose sales and market share to subject imports, and significantly depressed the U.S. processors' and fishermen's prices for fresh and frozen warmwater shrimp. The U.S. processors' loss of sales and market share to subject imports led to declines in their production, capacity utilization, and U.S. shipments. While the processors' financial performance was weak in 2021, its lower output and depressed prices as a result of subject import underselling caused a sharp decline in the industry's financial performance during the POI, including operating losses in 2022 and 2023. U.S. fishermen also experienced declining financial performance, as U.S. processors, faced with loss of market share and lower prices due to subject imports, lowered the price they would pay for fresh shrimp, resulting in lower prices for fishermen and reducing their incentive to shrimp, which in turn resulted in fewer fishing days, fewer boats in

NON-CONFIDENTIAL VERSION

operation, fewer {production-related workers}, and lower output.

*Confidential Opinion* at 76-77, Appx1338-1339; USITC Pub. 5566 at 76-77.

The Commission was not persuaded that the domestic industry's performance was caused by factors other than cumulated subject imports. Respondents presented evidence of other factors, including biological limits on the volume of wild-caught shrimp that U.S. fishermen could harvest and the lack of correlation between the volume of subject imports and domestic supply. *Confidential Opinion* at 77-78, Appx1339-1340; USITC Pub. 5566 at 77-78. Despite historical data on the record to the contrary, the Commission found that the quantity of harvested warmwater shrimp and frozen shrimp production was dictated by the financial incentives of the U.S. fishermen. *Confidential Opinion* at 79, Appx1341; USITC Pub. 5566 at 79. The Commission also disagreed with the respondents that declining demand caused any injury to the domestic industry, citing increasing volumes of cumulated subject imports (despite evidence that import volumes actually declined over most of the POI), the shift in market share from U.S. processors to cumulated subject imports,

and U.S. processors' ability to supply additional volumes of frozen shrimp. *Confidential Opinion* at 81, Appx1343; USITC Pub. 5566 at 81.

## IV. Subject Matter Jurisdiction and Standard of Review

### A. The Court Has Subject Matter Jurisdiction

Plaintiffs bring this action pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) to review final affirmative determinations made by the Commission under 19 U.S.C. §§ 1673d(b) and 1671d(b). As a result, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

### B. Standard of Review

#### 3. The Commission Must Support its Determinations with Substantial Evidence

With respect to factual findings and conclusions, the Commission's determinations shall not be upheld if they are "unsupported by substantial evidence on the record." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (quoting *Nippon Steel v. United States*, 337 F.3d 1373, 1379 (Fed. Cir.

2003)).  "Substantial evidence is more than a mere scintilla."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994); *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The existence of substantial evidence is determined by a review of the record as a whole, including whatever "fairly detracts" from the agency's determination.  *See, e.g., Universal Camera*, 340 U.S. at 488 (reviewing authority must consider "the record in its entirety . . . , including the body of evidence opposed to the {agency's} view"); *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997); *Tropicana Prods., Inc. v. United States*, 484 F. Supp. 2d 1330, 1347 (Ct. Int'l Trade 2007).

The Commission "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608, 624 (Ct. Int'l Trade 1993); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011) (because the agency "failed to take into account record

NON-CONFIDENTIAL VERSION

evidence that fairly detracts from the weight of the evidence supporting its . . . determinations, these determinations are not supported by substantial evidence"). Nor can the Commission base its findings on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1317 (Ct. Int'l Trade 2023); *see Shandong Rongxin Import & Export Co., v. United States*, 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016) (quoting *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987)). While the Commission "need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermine{} its reasoning and conclusion." *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 776 F. Supp. 3d 1290, 1302 (Ct. Int'l Trade 2025); *Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221, 1248 (Ct. Int'l Trade 2022) (quoting *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001) (internal citation omitted), *aff'd Altx*, 370 F.3d at 1116); *JMC Steel Group v. United States*, 24 F. Supp. 3d 1290, 1304 (Ct. Int'l Trade 2014) (the Commission must "address significant arguments of the parties which impact{} the reliability of its reasoning and conclusions."). The

NON-CONFIDENTIAL VERSION

Commission cannot rely on mere speculation or presumptions unsupported by record evidence to avoid examining relevant evidence. *See, e.g.*, *OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("Mere speculation is not substantial evidence."); *LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990) (stating that when there is salient evidence in the record, an agency's "speculation . . . must yield to evidence"); *Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) (remanding where the agency's decision was based on "mere assumptions, which find no apparent support in record evidence").

In determining whether the Commission's determinations are supported by substantial evidence, the Court must ensure that the Commission has taken a "hard look" at the evidence and issues and has not relied on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970) (noting that it is the responsibility of the court to reverse a determination where "the agency has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making" (footnote omitted)); *Shandong*

17

NON-CONFIDENTIAL VERSION

*Rongxin*, 163 F. Supp. 3d at 1252. It is not sufficient for the Court to look only at the evidence supporting the Commission's conclusion. The Court must engage in a "thorough, probing, in-depth review" of all material evidence in the record to determine whether the Commission's determinations are supported by substantial evidence. *SCM Corp. v. United States*, 487 F. Supp. 96, 99 (Cust. Ct. 1980) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).

> 4. The Commission's Determinations Must Be in Accordance with Law

The Commission's determination shall not be upheld if it is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The Court "review{s} the Commission's conclusions of law de novo." *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1369 (Fed. Cir. 2002) (citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1356 (Fed. Cir. 1996)). The Court must ask whether the Commission has acted consistently with the statute, exercised its discretion reasonably, and avoided acting in a manner that is arbitrary or capricious.

a.    The Commission Must Act Consistently with the Statute

Where the Commission has interpreted a provision of Title VII of the Tariff Act of 1930, the Court must "exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 603 U.S. at 394.  The Court starts its inquiry with the text and aims to determine its "ordinary meaning at the time Congress enacted the statute."  *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up).  "{W}hen the meaning of the statute's terms is plain," the Court's job is "at an end."  *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020).  When interpreting ambiguous statutes, the Court is not permitted to defer to the Commission, even on technical aspects of statutory interpretation, because "Congress expects courts to handle technical statutory questions."  *Loper Bright*, 603 U.S. at 402; *see also OCP S.A. v. United States*, 776 F. Supp. 3d 1245, 1252 (Ct. Int'l Trade 2025) ("courts no longer defer to agencies' interpretations of their governing statutes").  Instead, the Court is required to "use every tool at {its} disposal to determine the best reading of the statute and resolve the ambiguity."  *Loper Bright*, 603 U.S. at 400.

NON-CONFIDENTIAL VERSION

b.   The Commission Cannot Act Arbitrarily and Capriciously

If the Commission acts arbitrarily or capriciously, its determination is not in accordance with law.  *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ("Commerce's decision . . . will be set aside if it is arbitrary and capricious." (quoting *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012))).  The exercise of discretion does not excuse the Commission from its obligation to avoid arbitrary action.  *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1337 (Ct. Int'l Trade 2010).  In so doing, the Commission must engage in reasoned decision-making, by "examin{ing} the relevant data and articulat{ing} a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *Bando Chem. Indus., Ltd. v. United States*, 787 F. Supp. 224, 227 (Ct. Int'l Trade 1992).  Moreover, section 777(i)(3)(B) of the Tariff Act requires the Commission "to include in a final determination of injury an

NON-CONFIDENTIAL VERSION

explanation of the basis for its determination that addresses relevant arguments that are made by interested parties . . . concerning volume, price effects, and impact on the industry of imports of the subject merchandise." 19 U.S.C. § 1677f(i)(3)(b). Failure to consider "an important aspect of the problem" renders a determination arbitrary. *State Farm*, 463 U.S. at 43; *see also Tropicana Prods.*, 484 F. Supp. 2d at 1347 (holding that Commission's determination was "arbitrary and capricious because it did not address many important issues relating to the effects of the short supply of domestic oranges upon the domestic industry"). Similarly, the Commission acts arbitrarily when it "offer{s} an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).

The Commission's duty not to act in an arbitrary fashion also requires it to engage in consistent and even-handed decision-making. It must act consistently with its past practice or articulate a reasoned explanation for departing from that practice. *See, e.g.*, *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) (remanding to Commerce and explaining that "{o}nce Commerce establishes a course of

action . . . Commerce is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary"); *Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1088 (Ct. Int'l Trade 1988) ("While the Commission is not obligated to follow prior decisions if new arguments or facts are presented that support a different conclusion, this does not permit the Commission to act arbitrarily. This is because it is also a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure." (citations omitted)); *Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290, 1297 (Ct. Int'l Trade 2007) (remanding because "Commerce did not attempt to explain why it acted contrary to its own precedent"). The Commission also cannot treat like situations differently without providing adequate explanation. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996))); *Royal Thai Gov't v. United States*, 502 F. Supp. 2d 1334, 1341 (Ct. Int'l Trade 2007)

NON-CONFIDENTIAL VERSION

("Commerce may not treat two like situations differently without explanation.").

In sum, the Court must ensure that the Commission's decision is reasoned and fair. "The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues" with "rigorous insistence on the need for conjunction of articulated standards and reflective findings, in furtherance of evenhanded application of law, rather than impermissible whim, improper influence, or misplaced zeal." *Greater Boston Television*, 444 F.2d at 851-52.

V.    Summary of Argument

The Commission's final determinations suffer from numerous errors, each of which provide a separate basis to remand. The Commission reached several decisions that are not supported by substantial evidence by mischaracterizing the record and disregarding contradictory information. First, in determining that underselling by subject imports was significant, the majority misapplied the statute and contradicted record evidence. Second, in determining that subject imports had a significant negative impact on the domestic industry, the majority relied on a small number of datapoints stripped from context

and disregarded overwhelming record evidence showing that the domestic industry's financial performance improved relative to demand during the POI.

Aside from these material missteps, the Commission also erred by attributing material injury to subject imports, improperly disregarding record evidence showing other contributing factors to any such injury. The majority also failed to adequately develop the record by declining to adopt comments on draft questionnaires.

Finally, the Commission applied an unlawful interpretation of the term "significant" and "material" that essentially reads those words out of the statute. The application of these erroneous interpretations in turn tainted the Commission's determinations.

VI. The Commission's Final Determinations Are Not Supported by Substantial Evidence or Otherwise Not in Accordance with Law

    A. The Commission's Pricing Analysis Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

The Commission improperly found that subject imports caused negative price effects. *See Confidential Opinion* at 54-69, Appx1316-1331; USITC Pub. 5566 at 54-69. The statute requires the Commission

to "consider whether -- (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii). Thus, the statute requires the Commission to not only find underselling but also examine how subject imports affected the prices of the domestic like product or otherwise impacted the domestic industry.   19 U.S.C. § 1677(7)(C)(ii); *Coalition for Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 15 F Supp. 2d 918, 924-25 (Ct. Int'l Trade 1998); *Stainless Steel Round Wire from Canada, India, Japan, Korea, Spain, Taiwan*, Inv. Nos. 731-TA-781-86 (Final), USITC Pub. 3194 at 14-15 (May 1999); *Forged Steel Fittings from India and Korea*, Inv. Nos. 701-TA-631 & 731-1463-1464 (Final), USITC Pub. 5137 at 30 (Nov. 2020).

The statute directs the Commission to evaluate whether underselling by subject imports caused negative price effects through two mechanisms – price depression and price suppression.

NON-CONFIDENTIAL VERSION

First, the statute directs the Commission to determine whether subject imports "depress{} prices to a significant degree."  19 U.S.C. § 1677(7)(C)(ii)(II).

Second, the statute directs the Commission to determine whether subject imports "prevent{} price increases, which otherwise would have occurred, to a significant degree."  19 U.S.C. § 1677(7)(C)(ii)(II).

The Commission determined that "cumulated subject imports undersold the domestic like product to a significant degree, causing subject imports to gain sales and market share at the expense of the domestic industry, and depressed prices of the domestic like product to a significant degree." *See Confidential Opinion* at 69, Appx1331; USITC Pub. 5566 at 69.  The Commission did not reach a determination regarding price suppression. *See  Confidential Opinion* at 69, Appx1331; USITC Pub. 5566 at 69.  However, the record does not support a finding of either price depression or price suppression.  Specifically, the record does not support a finding of significant price depression because the domestic industry did not lose significant market share to subject imports and the timing of changes to the domestic industry's financial performance is not correlated with the timing of underselling and price

declines.  In addition, the record does not support a finding of significant price suppression by the Commission because the domestic industry was able to adjust prices to cover changes in its costs.

> 1. The Commission Improperly Found Underselling Was Significant when the Domestic Industry's Market Share Was Nearly Unchanged

The Federal Circuit has held that "{e}vidence of underselling alone is legally insufficient to support an affirmative injury determination." *See Coalition for Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 15 F Supp. 2d 918, 924-25 (Ct. Int'l Trade 1998) (quoting *BIC Corp. v. United States*, 964 F. Supp. 391, 401 (Ct. Int'l Trade 1997).  Instead, "the Commission has a statutory mandate to consider not only whether the subject imports have significantly undersold the domestic like product, but also how the subject imports {a}ffect the prices of the domestic like product."  *See id.*; *Stainless Steel Round Wire from Canada, India, Japan, Korea, Spain, Taiwan*, Inv. Nos. 731-TA-781-86 (Final), USITC Pub. 3194 at 14-15 (May 1999); *Forged Steel Fittings from India and Korea*, Inv. Nos. 701-TA-631 & 731-1463-1464 (Final), USITC Pub. 5137 at 30 (Nov. 2020).  Therefore, the Commission typically

assesses the effect of subject import underselling on sales of the domestic like product.

In this case, subject imports that were purportedly undersold did not cause the domestic industry to lose significant market share to subject imports. From 2021 to the 2024 interim period, the domestic industry lost only 0.3 percentage points of market share. *See Confidential Staff Report* at C-3 (Table C-1), Appx1226; USITC Pub. 5566 at C-3 (Table C-1). The Commission's analysis addressed only the three full years of the POI (2021-2023). *See Confidential Staff Report* at C-3 (Table C-1), Appx1226; USITC Pub. 5566 at C-3 (Table C-1). By considering changes in market share for only part of the POI, the Commission ignored the domestic industry's rising market share at the end of the POI. *See Confidential Opinion* at 58, Appx1320; USITC Pub. 5566 at 58; *Changzhou Wujin*, 701 F.3d at 1379 (remanding an agency determination because the agency "acted in an arbitrary and capricious manner" by "cherry-pick{ing} the single data point that would have the most adverse effect possible" on the foreign producer).

The small shift in the domestic industry's market share by the end of the full POI is not substantial evidence of significant underselling or

NON-CONFIDENTIAL VERSION

material injury. The Commission was required to address the interim period in its analysis because end-of-POI data is highly relevant to the Commission's task of assessing present material injury by subject imports to the domestic industry. The statute requires the Commission to determine whether the domestic injury "*is* materially injured" or "*is* threatened with material injury." 19 U.S.C. § 1671d(b)(1)(A) (emphasis added). In making a present injury determination, the Commission "must consult evidence within a time frame as close as possible to the vote day." *Usinor v. United States*, 26 CIT 767, 779 (2002); *accord Chr. Bjelland Seafoods A/S v. United States*, 19 CIT 35, 43 (1992). Because it is closer to the vote date, data at the end of the POI are more indicative of the condition of the domestic industry at the time of the Commission's vote than data from earlier in the POI. As a result, the Commission's disregard for such data renders is conclusions unsupported by substantial evidence.

Furthermore, the Commission's reliance on combined market share for fresh and frozen shrimp was deficient because domestic production of frozen shrimp was more comparable to cumulated subject imports of frozen shrimp. *See Confidential Opinion* at 58, Appx1320; USITC Pub.

5566 at 58. While the Commission included fresh shrimp in the domestic like product after a semifinished product analysis, it also acknowledged the limited market for fresh shrimp. *See Confidential Opinion* at 15, Appx1277; USITC Pub. 5566 at 15 ("fresh warmwater shrimp is overwhelmingly sold in a processed form"). U.S. processor questionnaire responses further highlight the differences between the markets for frozen and fresh shrimp, explaining that the fresh shrimp market is more [     ] and dependent on [                    ] than the market for frozen shrimp. *See Confidential Staff Report* at D-3 (Table D-1), Appx1232. By contrast, frozen shrimp is sold nationwide by a variety of retailers, distributors, food processors, and restaurants. *See Confidential Staff Report* at II-2 to II-4, Appx1027-1029; USITC Pub. 5566 at II-2 to II-4. As a result of these differences, competition between the markets for fresh and frozen shrimp is significantly attenuated, and imported frozen shrimp is unlikely to impact the U.S. market share for fresh shrimp. Moreover, according to the Staff Report, there were no imports of fresh shrimp from subject countries. *Confidential Staff Report* at IV-37 (Table IV-11), Appx1116; *id.* at IV-7 to IV-9 (Table IV-2), Appx1086-1088; USITC Pub. 5566 at IV-7 to IV-9, IV-37. Because all subject imports were

NON-CONFIDENTIAL VERSION

frozen shrimp and frozen shrimp does not compete with fresh shrimp, subject imports did not compete directly with the U.S. fresh shrimp industry. Therefore, the Commission should not have relied on changes to the U.S. market share for fresh shrimp to determine the price effects of subject imports of frozen shrimp. The Commission did not address this deficiency in its analysis, which obfuscates the domestic industry's exceedingly small change in U.S. market share during the POI.

Moreover, in finding that changes in the domestic industry's market share were significant, the Commission impermissibly read the word "significant" out of the statute. Under the Commission's application of the statute, *any* underselling could be significant. While the statute may not define a numerical threshold for "significant" price underselling, the term is an express statutory limitation that must be given meaning. A court should "construe statutes, where possible, so as to avoid rendering superfluous any parts thereof." *Astoria Fed. Sav. & Loan*, 501 U.S. at 112. "Superfluous" is defined as "not needed" (Merriam-Webster Dictionary), "extra and not necessary" (Cambridge Dictionary), or "unnecessary" (Oxford English Dictionary). By failing to place any limits on its construction of the word "significant," the Commission

impermissibly rendered the word superfluous by effectively treating it as unnecessary, not needed, and extra. "Congress expects courts to handle technical statutory questions." *Loper Bright*, 603 U.S. at 402. The Court is therefore empowered to read every word in the statute and find that the change in the domestic industry's market share was not significant.

Relatedly, the Commission's finding that such a small change in market share is "significant" runs afoul of the plain language of the statute. The word "significant" is defined as "having or likely to have influence or effect" or "of a noticeably or measurably large amount" (Merriam-Webster Dictionary); "sufficiently great or important to be worthy of attention" (Oxford English Dictionary); or "important, large, or great, esp. in leading to a different result or to an important change" (Cambridge Dictionary). By any of these definitions, the impact of underselling on the domestic industry's market share was not significant because the domestic industry's market share decreased by only 0.3 percentage points from 2021 to interim 2024. *See Confidential Staff Report* at C-3 (Table C-1), Appx1226; USITC Pub. 5566 at C-3 (Table C-1). Such a small change was not "having or likely to have influence or effect" and could not reasonably be construed as "a noticeably or

measurably large amount," "important," or "great." Therefore, no reasonable reading of the statute supports the Commission's finding that underselling by subject imports was significant. Instead, the Court is required to "use every tool at {its} disposal to determine the best reading of the statute and resolve the ambiguity," *Loper Bright*, 603 U.S. at 400, and find that underselling by subject import was not significant.

### 2. The Commission's Analysis is Inconsistent with Pricing Data on the Record

The timing of underselling and changes in market share further refutes the Commission's conclusion that underselling caused changes to the domestic industry's market share.

First, the Commission found that underselling caused "subject imports to gain sales and market share at the expense of the domestic industry" at the same time that subject imports "depressed prices of the domestic like product to a significant degree." *See Confidential Opinion* at 58, Appx1320; *Confidential Staff Report* at C-3, C-5 (Table C-1), Appx1226, Appx1228; USITC Pub. 5566 at 58, C-3, C-5. The record does not support the Commission's findings. Price trends during the POI were not positively correlated with changes in the domestic industry's market

share. As the Commission acknowledges, import prices increased from 2021 to 2022, the only period in which the domestic industry lost market share. *See Confidential Opinion* at 63, Appx1325; USITC Pub. 5566 at 63. When domestic producers' prices were purportedly depressed by subject imports from 2022 to 2023 and in interim 2024, the domestic industry gained market share. *See Confidential Staff Report* at C-3, C-5 (Table C-1), Appx1226, Appx1228; USITC Pub. 5566 at C-3, C-5. During the period of declining prices, the domestic industry also experienced increased operating income, and U.S. processors increased capital expenditures, indicating no adverse effect on the domestic industry. *See Confidential Staff Report* at C-3, C-5 (Table C-1), Appx1226, Appx1228; USITC Pub. 5566 at C-3, C-5.

Second, the timing of underselling and changes in market share are not consistent with the Commission's analysis. The Commission claims that there was "pervasive underselling by subject imports which held a commanding and expanding share of the U.S. market throughout the POI." *See Confidential Opinion* at 67, Appx1329; USITC Pub. 5566 at 67. However, the domestic industry lost market share and reduced shipments only from 2021 to 2022. *See Confidential Staff Report* at C-3,

NON-CONFIDENTIAL VERSION

C-5 (Table C-1), Appx1226, Appx1228; USITC Pub. 5566 at C-3, C-5 (Table C-1). From 2022 to 2023 and in interim 2024, the domestic industry gained market share and increased shipments while purported underselling continued. *Compare Confidential Staff Report* at C-3 to C-4 (Table C-1), Appx1226-1228 *with id.* at V-18 (Table V-12), Appx1141; *see* USITC Pub. 5566 at C-3 to C-4, V-18. Therefore, the record does not support the Commission's assertion that significant underselling by subject imports depressed prices and caused a shift in market share. *See Confidential Opinion* at 69, Appx1331; USITC Pub. at 69.

It is also worth noting that the Commission's reference to subject imports having a "commanding" share of the market must be considered in context. There is a limited volume of shrimp that U.S. shrimpers can fish from the sea and, in turn, have processed into frozen shrimp. The so-called "commanding" nature of subject import market share is a fact of life driven by the fact that U.S. demand for frozen shrimp far outstrips the domestic industry's ability to supply the market.

The Commission's pricing analysis and explanations run contrary to the record evidence, making it both arbitrary and capricious and unsupported by substantial evidence. *See NMB Sing. Ltd.*, 557 F.3d at

1319-20; *State Farm*, 463 U.S. at 43 (there must be a "rational connection between the facts found and the choice made." (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962))).

### 3. The Record Does Not Support a Finding of Price Suppression

The Commission did not explicitly express views regarding whether subject imports suppressed prices by preventing price increases that would have otherwise occurred. The record does not support a finding of significant price suppression for two reasons. First, U.S. demand declined from 2021-2023. *See Confidential Staff Report* at C-3 (Table C-1), Appx1226; USITC Pub. 5566 at C-3 (Table C-1). In previous cases, the Commission has stated that it does not expect price increases during periods of declining demand. *See Sodium Metal from France*, Inv. No. 731-TA-1135 (Final), USITC Pub. 4045 (Nov. 2008) at 21-22 (attributing the domestic industry's inability to raise prices to declining demand instead of subject imports); *Magnesium from Israel*, Inv. Nos. 701-TA-614 and 731-TA-1431 (Final), USITC Pub. 5009 at 29 (Jan. 2020) (same). Similarly, in this case, declining demand indicates that the domestic industry's prices would not have increased in the absence of underselling

by subject imports.  *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996))); *Royal Thai Gov't v. United States*, 502 F. Supp. 2d 1334, 1341 (Ct. Int'l Trade 2007) ("Commerce may not treat two like situations differently without explanation.").

Second, the domestic industry was able to prevent its prices from declining by more than the decline in the domestic industry's COGS.  As a practice, the Commission measures price suppression by changes in the ratio of the COGS to total net sales on an annual basis.  *See Confidential Staff Report* at C-5 (Table C-1), Appx1228; USITC Pub. 5566 at C-5 (Table C-1).  Under the practice, an increase in the ratio over the POI indicates that the domestic industry could not adjust prices to cover cost changes and maintain a profitable margin.  *See Confidential Staff Report* at C-5 (Table C-1), Appx1228; USITC Pub. 5566 at C-5 (Table C-1).  In this case, U.S. processors' COGS/net sales ratio declined from 2021-2023, indicating that the domestic industry that was successful at preventing prices from declining to a greater extent than cost declines.  *See*

*Confidential Staff Report* at C-5 (Table C-1), Appx1228; USITC Pub. 5566 at C-5 (Table C-1).

The Commission did not explain its departure from past practice that there must be more than underselling; underselling must affect the prices for or volume of the domestic like product. *See Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003) (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) ("{The agency} may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case. Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.")). Because the record does not support a finding of either significant price depression or price suppression, the Commission's affirmative material injury determination is not supported by substantial evidence and otherwise not in accordance with law.

B.    The Commission's Determination of Negative Impact from the Subject Imports is Not Supported by Substantial Evidence and Not in Accordance with Law

In the determinations, the Commission concluded that subject imports had a significant negative impact on the domestic industry. *See Confidential Opinion* at 91, Appx1353; USITC Pub. 5566 at 90. To support its conclusion, the Commission points to "isolated tidbits of data." *OCP S.A.*, 658 F. Supp. 3d at 1317. However, no reasonable mind would consider these limited data points as adequate to support the Commission's conclusion. *Zhejiang DunAn Hetian Metal*, 652 F.3d at 1340. The Commission compounded its error when it concluded that these limited data points were sufficient to demonstrate significant negative impact, reading the critical term "material" out of the statute.

1.    The Record Does Not Support the Commission's Finding that Subject Imports Caused a Significant Negative Impact on the Domestic Industry

In concluding that subject imports significantly negatively impacted the domestic industry, the Commission found that such imports "caused the domestic industry to lose sales and market share to subject imports." *Confidential Opinion* at 76, Appx1338; USITC Pub. 5566 at 76. The Commission relied on isolated data points to support its

determinations. For example, the Commission relied on a small (*i.e.*, 0.8 percentage point) change in the domestic industry's market share for fresh and frozen shrimp from 2021 to 2023. *Confidential Opinion* at 76, Appx1338; USITC Pub. 5566 at 76. *Compare Confidential Staff Report* at C-3 (Table C-1), Appx1226; USITC Pub. 5566 at C-3 (Table C-1). The Commission's claim that the domestic industry lost significant market share to subject imports is deficient because its determination relied on data for both fresh and frozen shrimp for only part of the POI, *i.e.*, 2021-2023, and ignored data for interim 2024. *See Confidential Opinion* at 82, Appx1344; *Confidential Staff Report* at C-3 (Table C-1), Appx1226; USITC Pub. 5566 at 82, C-3. If the Commission had relied on data for the full POI when evaluating whether U.S. market share for frozen shrimp declined significantly, it could not reasonably have found the change of 0.3 percentage points from 2021 to interim 2024 to be significant. *See Confidential Staff Report* at C-3 (Table C-1), Appx1226; USITC Pub. 5566 at C-3 (Table C-1). By failing to take into account record evidence that fairly detracts from its conclusions, the Commission's conclusion is not supported by substantial evidence. *See Ad Hoc Shrimp Trade Action Comm.*, 791 F. Supp. 2d at 1334.

NON-CONFIDENTIAL VERSION

Moreover, the Commission misconstrued other record evidence indicating that the domestic industry did not experience declining performance relative to declining demand during the POI. *Confidential Opinion* at 73, 76, Appx1335, Appx1336; USITC Pub. 5566 at 73, 75. The statute requires the Commission to "evaluate all relevant economic factors which have a bearing on the state of the industry{.}" 19 U.S.C. § 1677(7)(C)(iii). Several factors indicate the domestic industry's performance improved relative to the 13.6 percentage point decline in apparent U.S. consumption during the POI. *See Confidential Staff Report* at C-3 to C-5 (Table C-1), Appx1226-1228; USITC Pub. 5566 at C-3 to C-5 (Table C-1). In particular, the domestic industry's capital expenditures increased by 26.1 percent from 2021 to 2023. *See Confidential Staff Report* at C-3 to C-5 (Table C-1), Appx1226-1228; USITC Pub. 5566 at C-3 to C-5 (Table C-1). Moreover, from 2021 to 2023, the domestic industry's gross profit, net income, capacity utilization, number of production-related workers, hours worked, and wages paid declined by less than apparent U.S. consumption. *See Confidential Staff Report* at C-3 to C-5 (Table C-1), Appx1226-1228; USITC Pub. 5566 at C-3 to C-5 (Table C-1). When apparent U.S. consumption rebounded during

the interim period, U.S. processors' sales increased by 34.2 percent and gross profit increased by 43.5 percent, indicating that the domestic industry was well-positioned to compete in an increasing demand environment. *See Confidential Staff Report* at C-5 (Table C-1), Appx1228; USITC Pub. 5566 at C-5 (Table C-1). Additionally, the change in market share was minimal, as the domestic industry lost only 0.3 percentage points of market share, even as it experienced significant supply constraints over the POI. *See Confidential Staff Report* at C-3 (Table C-1), Appx1226; USITC Pub. 5566 at C-3 (Table C-1).

Rather than engage with the domestic industry's performance indicators during the POI in the context of declining demand, the Commission simply presented certain cherry-picked negative indicators as evidence that the domestic industry was injured by subject imports. *See Confidential Opinion* at 71-77, Appx1333-1339; USITC Pub. 5566 at 70-77. The Commission dismissed the importance of demand conditions by citing the very small decline in U.S. market share and cherry-picked performance indicators that declined more than U.S. demand. *See Confidential Opinion* at 81-82, Appx1343-1344; USITC Pub. 5566 at 81-82; *cf. Sodium Metal from France*, Inv. No. 731-TA-1135 (Final), USITC

Pub. 4045 (Nov. 2008); *Magnesium from Israel*, Inv. Nos. 701-TA-614 and 731-TA-1431 (Final), USITC Pub. 5009 at 29 (Jan. 2020); *Uncoated Groundwood Paper from Canada*, Inv. Nos. 701-TA-584 and 731-TA-1382 (Final), USITC Pub. 4822 (Sept. 2018) (incorporating detailed analysis of declining demand conditions into the Commission's impact analysis). Because the Commission's conclusion contradicts "the clear weight of the evidence," it is not supported by substantial evidence and otherwise not in accordance with law. *See Shandong Rongxin*, 163 F. Supp. 3d at 1252.

In the context of the domestic industry's overall resilient operational and financial performance over the full POI, the Commission's determination of significant negative impact from subject imports is "contrary to the clear weight of the evidence." *Shandong Rongxin*, 163 F. Supp. 3d at 1252. Because it "ignore{s} significant contradictory evidence," the Commission's price analysis is not supported by substantial evidence or otherwise not in accordance with law. *Mitsubishi Materials*, 820 F. Supp. at 624.

NON-CONFIDENTIAL VERSION

### 2. The Commission's Determinations Rely on an Unlawful Interpretation of "Material Injury" in the Statute

The Commission's conclusion that subject imports significantly impacted the domestic industry led to its ultimate determination that "an industry is materially injured by reason of subject imports." *Confidential Opinion* at 91, Appx1353; USITC Pub. 5566 at 91. Considering the substantial evidence of no negative impact on the domestic industry by reason of subject imports, the Commission's determinations were contrary to the plain meaning of the statute.

The statute defines "material injury" as harm that is not "inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). However, the record is clear that any injury suffered by the domestic industry was in fact "inconsequential, immaterial, or unimportant," as those terms are ordinarily understood.

Dictionaries define "inconsequential" as "irrelevant" (Merriam-Webster Dictionary), "of no consequence" (Cambridge Dictionary), and "of little or less importance" (Oxford English Dictionary). "Immaterial" is defined as "of no substantial consequence" (Merriam-Webster Dictionary), "not pertinent to the case or matter" (Cambridge Dictionary),

and "not important" (Oxford English Dictionary). "Unimportant" is defined as "lacking in importance" (Merriam-Webster Dictionary), "of no importance or moment" (Cambridge Dictionary), and "not important" (Oxford English Dictionary).

The Commission's ultimate determinations primarily rest on a very small decline in the domestic industry's market share, sales volumes that declined for reasons unrelated to subject imports, and performance indicators that declined by less than the decline in apparent U.S. consumption. *See Confidential Opinion* at 76-77, Appx1338-1339; USITC Pub. 76-77. The change in the domestic industry's market share was so small as to be "of no consequence" of "of little or less importance." The record shows that the domestic industry experienced relatively strong performance while facing challenging demand conditions. *See supra* Section VI.B.1. After demand rebounded in the interim period after declining from 2021 to 2023, the domestic industry's market share and financial performance surged in interim 2024. *See Confidential Staff Report* at C-3 to C-5 (Table C-1), Appx1226-1228; USITC Pub. 5566 at at C-3 to C-5 (Table C-1).

NON-CONFIDENTIAL VERSION

In light of the economic conditions during the POI and the domestic industry's strong performance with respect to a number of performance indicators, no reasonable fact finder could conclude that the domestic industry is suffering from "material injury," as that term is defined in the statute, by reason of subject imports.  For that reason, the Commission's ultimate determinations are also unsupported by substantial evidence. *See Zhejiang DunAn Hetian Metal Co.*, 652 F.3d at 1340 ("{s}ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotation marks omitted); *Mitsubishi Materials*, 820 F. Supp. at 624 (remanding the Commission's determination because it "ignore{d} significant contradictory evidence"). Furthermore, by effectively reading the word "material" out of the statute, the determinations are arbitrary and capricious and not in accordance with law.  *See Astoria Fed. Sav. & Loan*, 501 U.S. at 112; *see also Changzhou Wujin*, 701 F.3d at 1379 (remanding an agency determination because the agency "acted in an arbitrary and capricious manner" by "cherry-pick{ing} the single data point that would have the most adverse effect possible" on the foreign producer)*; Pakfood*, 724 F.

Supp. 2d. at 1337 (holding that an agency's exercise of discretion is not in accordance with law if it is arbitrary).

> ### C. The Commission Improperly Attributed Changes in the Domestic Industry's Performance to Subject Imports

The Commission improperly attributed changes in the domestic industry's performance to subject imports.  The statute requires the Commission to determine whether the domestic industry is "materially injured or threatened with material injury by reason of" subject imports but does not define the phrase "by reason of."  *See Confidential Opinion* at 25, Appx1287; USITC Pub. 5566 at 25 (citing 19 U.S.C. §§ 1671d(b), 1673d(b)).  The Commission's "evaluation under the 'by reason of' standard must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury." *Confidential Opinion* at 38, Appx1300; USITC Pub. 5566 at 38 (citing *Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003); *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008) ("'{T}his court requires evidence in the record 'to show that the harm occurred 'by reason of' the {less than fair value} imports, not by reason of

a minimal or tangential contribution to material harm caused by {less than fair value} goods.") (quoting *Gerald Metals, Inc.*, 132 F.3d at 722)). Furthermore, "{t}he legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold." *Confidential Opinion* at 39, Appx1301; USITC Pub. 5566 at 39. The Commission has previously attributed the domestic industry's financial position to other relevant factors, including domestic producer supply constraints, instead of subject imports. *See, e.g.*, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final), USITC Pub. 5560 at 74-75 (Nov. 2024).

The Commission erred by making unsupported findings that subject imports caused the domestic industry to lose significant market share.

1. The Commission Ignored Record Evidence Demonstrating Attenuated Competition Between Farm-Raised and Wild-Caught Shrimp

The Commission's conclusion that farm-raised shrimp is interchangeable with wild-caught shrimp is central to the Commission's finding of significant negative impact on the domestic industry "by reason of" subject imports. *See Confidential Opinion* at 59, Appx1321; USITC Pub. 5566 at 59. Nearly all imports were farm-raised shrimp and nearly all domestic like product was wild-caught shrimp. *See Confidential Opinion* at 42, 45, Appx1304, Appx1307 (citing *Confidential Staff Report* at IV-21 (Table IV-7), Appx1100); USITC Pub. 5566 at 42, 45.

In reaching its conclusions regarding interchangeability of farm-raised and wild-caught shrimp, the Commission first asserted that "some responding purchasers and importers reported that wild-caught and farm-raised shrimp have limited interchangeability," whereas "a majority of responding U.S. processors reported that farm-raised and wild-caught warmwater shrimp are always interchangeable." *See Confidential Opinion* at 59, Appx1321; USITC Pub. 5566 at 58-59. Second, the Commission asserted that "frozen warmwater shrimp is frequently marketed and sold in ways that downplay the distinctions

between domestic wild-caught shrimp and imported farm-raised shrimp," such that "retailers and consumers often do not know whether they have purchased wild-caught shrimp or farm-raised shrimp." *See Confidential Opinion* at 59, Appx1321; USITC Pub. 5566 at 59.    Third, the Commission cited questionnaire data indicating that U.S. purchasers do not make purchasing decisions based on country of origin.    *See Confidential Opinion* at 59, Appx1321; USITC Pub. 5566 at 59.  Fourth, the Commission claimed that, because questionnaire response data indicate that wild-caught and farm-raised shrimp have similar levels of quality, consistency, and count size, the two market segments must necessarily compete against each other. *See Confidential Opinion* at 59-60, Appx1321-1322; USITC Pub. 5566 at 59-60.

Each of the Commission's findings is unsupported by substantial evidence.  First, the Commission's characterization of the questionnaire data that "some" U.S. importers and purchasers reported "limited interchangeability" is inconsistent with the record.  *See Confidential Opinion* at 34, 59, Appx1296, Appx1321; USITC Pub. 5566 at 34, 59. Majorities of U.S. importers (70%), U.S. retailer and restaurant purchasers (58%), and U.S. food processor purchasers (57%) reported

NON-CONFIDENTIAL VERSION

that farm-raised and wild-caught shrimp were <u>never</u> interchangeable. *See Confidential Staff Report* at II-16, Appx1041; USITC Pub. 5566 at II-16.  A plurality of U.S. distributor or wholesaler purchasers (38%) agreed. *See Confidential Staff Report* at II-16, Appx1041; USITC Pub. 5566 at II-16.  Overwhelming majorities (97% of U.S. importers, 92% of U.S. retailer or restaurant purchasers, 69% of U.S. distributor or wholesaler purchasers, and 71% of U.S. food processor purchasers) always or sometimes distinguished between wild-caught and farm-raised shrimp. *See Confidential Staff Report* at II-16, Appx1041; USITC Pub. 5566 at II-16.  By any reasonable reading of the data, the Commission's characterization that "some" U.S. importers and purchasers reported "limited" interchangeability is inconsistent with the vast majority of importers and half of purchasers reporting that wild-caught and farm-raised shrimp are <u>never</u> interchangeable.  *See CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").  Moreover, this overwhelming record evidence that wild-caught and farm-raised shrimp are not interchangeable should have been central to the Commission's analysis regarding attenuated

competition. However, the Commission simply glossed over this significant record evidence in less than a sentence without explaining why the real record data was not relevant to the Commission's conclusions. *See Confidential Opinion* at 59, Appx1321; USITC Pub. 5566 at 59.

Second, the Commission's argument that U.S. purchasers and customers are unaware of differences between wild-caught and farm-raised shrimp ignores significant contradictory evidence. The Commission cited testimony, a photograph of a single package of frozen shrimp, and news articles provided by U.S. processors to support its conclusion. *See Confidential Opinion* at 59, Appx1321; USITC Pub. 5566 at 59. Taken together, these materials purport to show "frozen warmwater shrimp is frequently marketed and sold in ways that downplay the distinctions between domestic wild-caught shrimp and imported farm-raised shrimp," such that "retailers and consumers often do not know whether they have purchased wild-caught shrimp or farm-raised shrimp." *See Confidential Opinion* at 59, Appx1321; USITC Pub. 5566 at 59. However, the Commission's conclusion is inconsistent with overwhelming record evidence. *See Confidential Staff Report* at II-16,

Appx1041; USITC Pub. 5566 at II-16; *Hearing Tr.* at 150-153 (Statdfield), Appx58420-58423.    The Commission's conclusion that marketing of shrimp "inhibits purchasing decisions" based on production setting (*i.e.*, farm-raised or wild-caught) is inconsistent with U.S. purchaser questionnaire responses indicating that large majorities of each type of purchaser considers farm-raised and wild-caught shrimp to sometimes or never be interchangeable.    *Compare Confidential Opinion* at 59, Appx1321 *with Confidential Staff Report* at II-16, Appx1041; *see* USITC Pub. 5566 at 59, II-16.    Moreover, the Commission did not address that 19 of 20 purchasers reported that the availability of farm-raised shrimp is very or somewhat important.    *See Confidential Staff Report* at II-15 (Table II-7), Appx1040; USITC Pub. 5566 at II-15 (Table II-7).

Moreover, the Commission's conclusion that retailers "often do not know whether they have purchased wild-caught shrimp or farm-raised shrimp" is inconsistent with U.S. purchaser questionnaire responses and testimony in the staff conference and hearing.    Almost all U.S. restaurant and retailer purchasers reported that wild-caught and farm-raised shrimp were sometimes or never interchangeable, indicating that they could discern between shrimp of each production setting.    *See*

*Confidential Staff Report* at II-16, Appx1041; USITC Pub. 5566 at II-16.

In the staff conference, Publix testified that it "treat{s} wild and farmed

shrimp as two distinctly different product categories." *Staff Conference

Tr.* at 118 (Pizzutti), Appx55267. Costco corroborated this testimony in

the hearing when it testified in detail to its process for purchasing shrimp

in each production setting and the different standards and consumer

preferences for farm-raised and wild-caught shrimp. *Hearing Tr.* at 152-

153 (Statdfield), Appx58422-58423. Similarly, **[**


**]**. *See Confidential Staff Report* at II-13, Appx1038. Despite

the significant probative value of this information, the Commission did

not include a single reference to this testimony or U.S. purchaser

questionnaire responses, instead relying on U.S. processors' testimony to

determine U.S. retailers' ability to distinguish between farm-raised and

wild-caught shrimp. *Compare Confidential Opinion* at 59, Appx1321

*with Confidential Staff Report* at II-13, Appx1038; *Hearing Tr.* at 152-

153 (Statdfield), Appx58422-58423; *see* USITC Pub. 5566 at 58-59, II-13;

*Ad Hoc Shrimp*, 791 F. Supp. 2d at 1334 ("these determinations are not

supported by substantial evidence" because the agency "failed to take

into account record evidence that fairly detracts from the weight of the evidence supporting its . . . determinations").

Third, the Commission's reliance on U.S. purchaser questionnaire responses regarding preference for country of origin to draw conclusions regarding the interchangeability of wild-caught and farm-raised shrimp is not supported by substantial evidence. The Commission cited responses to a question in the U.S. purchaser questionnaire indicating that U.S. purchasers do not differentiate shrimp by country of origin. *See Confidential Opinion* at 59, Appx1321 (citing *Confidential Staff Report* at II-13 (Table II-5), Appx1038); USITC Pub. 5566 at 59. However, the Commission did not explain how these responses relate to the interchangeability of wild-caught and farm-raised shrimp. *See Confidential Opinion* at 59, Appx1321; USITC Pub. 5566 at 59. Where multiple subject countries produce farm-raised shrimp, indicating a preference for farm-raised shrimp does not necessarily indicate a preference for a certain country of origin. *See Confidential Staff Report* at IV-21 (Table IV-7), Appx1100; USITC Pub. 5566 at IV-21 (Table IV-7). For example, it would be consistent with the cited questionnaire responses for a purchaser to require farm-raised shrimp, but to be

indifferent regarding the source of the shrimp, *e.g.*, Indonesia or Vietnam, both of which produce farm-raised shrimp. *See Confidential Staff Report* at IV-21 (Table IV-7), Appx1100; USITC Pub. 5566 at IV-21 (Table IV-7). In that scenario, the purchaser would not view farm-raised and wild-caught shrimp as interchangeable but may not differentiate by country of origin. *Compare Confidential Staff Report* at II-13 (Table II-5), Appx1038 *with id.* at IV-21 (Table IV-7), Appx1100; USITC Pub. 5566 at II-13, IV-21. However, according to its analysis, the Commission would have treated this hypothetical response as support for the interchangeability of wild-caught and farm-raised shrimp. *Compare Confidential Opinion* at 59, Appx1321 *with Confidential Staff Report* at II-13 (Table II-5), Appx1038; USITC Pub. 5566 at 59, II-13. By failing to support its logical leap from the cited questionnaire responses to its conclusion regarding interchangeability, the Commission's analysis is not supported by substantial evidence. *See Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) (remanding where the agency's decision was based on "mere assumptions, which find no apparent support in record evidence").

Fourth, the Commission did not explain why comparable "product consistency, quality meets industry standards, quality exceeds industry standards, and count size" supports its conclusion regarding interchangeability, where purchasers have different standards for wild-caught and farm-raised shrimp. *Compare Confidential Opinion* at 59-60, Appx1321-1322 *with Confidential Staff Report* at II-13, Appx1038; *Hearing Tr.* at 152-153 (Statdfield), Appx58422-58423; USITC Pub. 5566 at 59, II-13. Costco testified that, although it purchases both wild-caught and farm-raised shrimp, it does "not hold processors to the same standards that we have for farm-raised shrimp, otherwise we would not buy domestic wild-caught shrimp." *Hearing Tr.* at 152-153 (Statdfield), Appx58422-58423. Consistent with Costco's testimony, the record shows that U.S. purchasers source shrimp that meets their standards for each market segment, while continuing to differentiate between those market segments. *See Confidential Staff Report* at II-13, Appx1038; USITC Pub. 5566 at II-13; *Hearing Tr.* at 152-153 (Statdfield), Appx58422-58423. The Commission did not address this shortcoming in its argument, and in fact did not address Costco's testimony or **[           ]** U.S. purchaser questionnaire response at all. Therefore, the Commission's conclusions

NON-CONFIDENTIAL VERSION

regarding interchangeability are not supported by substantial evidence. *See Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (requiring the Commission to address evidence that "fairly detracts" from its determination).

The Commission's determination lacks substantial evidence that there was material injury to the domestic industry "by reason" of cumulated subject imports when competition with subject imports was attenuated.  By failing to address testimony by Costco and overwhelming evidence from U.S. purchaser questionnaire responses that farm-raised and wild-caught shrimp are not interchangeable, the Commission "failed to take into account record evidence that fairly detracts" from its conclusion regarding interchangeability, such that its impact analysis is not supported by substantial evidence.  *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011); *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608, 624 (Ct. Int'l Trade 1993) (holding that the Commission "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence.").  Further, because it failed to clearly explain the relevance of questionnaire

response data on purchaser preference for country of origin and purchaser standards, the Commission's conclusions are based not on substantial evidence, but on speculative claims that "find no apparent support in record evidence." *See Jinan Yipin*, 526 F. Supp. 2d at 1375. The Commission's flawed analysis yielded a "result contrary to the clear weight of the evidence." *OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1317 (Ct. Int'l Trade 2023). As a result, no reasonable mind would accept the Commission's analysis as adequate to support its conclusion regarding interchangeability. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). Moreover, the Commission's failure to acknowledge attenuated competition was arbitrary and an abuse of discretion for failure to follow the statute and past practice. *See, e.g., SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

For these reasons, the Commission's impact analysis was unsupported by substantial evidence and otherwise not in accordance with law.

2. The Commission Failed to Collect Questionnaire Response
Data that Would Elicit Record Evidence of Alternative
Causes of Decreased Domestic Industry Market Share

The Commission dismissed several alternative causes of negative
impact on the domestic industry, including increased diesel fuel prices,
biological supply limitations, and hurricanes. *Confidential Opinion* at
77-86, Appx1339-1348; USITC Pub. 5566 at 77-86. However, for each of
these alternative explanations, the Commission was forced to draw
conclusions based on inadequate information as a result of the
Commission's refusal to adopt proposed revisions to questionnaires. In
their respective briefs, Ecuadorian and Indian respondents address the
Commission's errors with regard to diesel fuel prices and biological
supply limitations.

As discussed in Section VI.C.1, the Commission did not adequately
consider attenuated competition between subject imports and domestic
production. *See supra* Section VI.C.1. In particular, the Commission
based its determination that U.S. purchasers view foreign and domestic
merchandise as interchangeable on the testimony of U.S. processors and
a single picture of a purportedly misleading package of frozen shrimp.
*See supra* Section VI.C.1. The Commission's inability to address the vast

NON-CONFIDENTIAL VERSION

differences between imported shrimp and domestic shrimp was driven by its unwillingness to adopt proposed revisions to draft questionnaires. For example, the Commission did not revise its purchaser questionnaire to include "raw material (farmed or wild-caught shrimp), freezing type (IQF, block, or other). availability of cooked shrimp, count size" as examples of non-price factors that were important to purchasers, as proposed by Vietnamese respondents. *See* Vietnamese Respondents' Comments on Draft Final Phase Questionnaires at 4, Appx57187. In addition, the Commission declined to adopt the additional pricing products proposed by Ecuadorian respondents, including for black tiger shrimp, that would have demonstrated the domestic industry's limited ability to supply the varieties demanded by U.S. purchasers. *See* Ecuadorian Respondents' Comments on Draft Final Phase Questionnaires at 2-4, Appx57170-57172. If the Commission had asked purchasers these questions, there would have been data on the record for the Commission to assess the level of attenuated competition between foreign and domestic merchandise.

The Commission "is obligated to make active, reasonable efforts to obtain relevant data." *Allegheny Ludlum Corp. v. United States*, 287 F.3d

NON-CONFIDENTIAL VERSION

1365, 1373 (Fed. Cir. 2002); *Bethlehem Steel Corp. v. United States*, 294 F. Supp. 2d 1359, 1370 (Ct. Int'l Trade 2003). In this case, however, the Commission made "no effort to seek relevant data" because it declined to adopt comments on draft questionnaires that would have clarified important alternative causes of significant negative impact on the domestic industry. *See Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 564 (Ct. Int'l Trade 1988). Instead, because the Commission failed to develop an adequate record, its conclusions attributing significant negative impact to subject imports are based on a "mere scintilla" of record evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994). Therefore, the Commission's attribution of material injury to subject imports was unsupported by substantial evidence and otherwise not in accordance with law.

## VII. Conclusion

For the foregoing reasons, we respectfully request that the Court grant Plaintiff's motion for judgment on the agency record and remand

NON-CONFIDENTIAL VERSION

this matter to the Commission for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
Julia K. Eppard
Paul S. Bettencourt
AKIN GUMP STRAUSS
HAUER & FELD LLP
2001 K Street, NW
Washington, DC 20006

Dated: August 22, 2025

*Counsel to Shrimp Committee*
*of the Vietnam Association of*
*Seafood Exporters and Producers*

NON-CONFIDENTIAL VERSION

CERTIFICATE OF COMPLIANCE

I, Matthew R. Nicely, an attorney with Akin Gump Strauss Hauer & Feld LLP, certify that Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record contains 11,568 words (according to the word count feature of the Microsoft Word processing program) and therefore complies with the word count limitation set forth in Paragraph 2(B)(1)(a) of the Standard Chambers Procedures of the Court.

In addition, we certify that Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record contains 18 unique words (including numbers) designated as confidential and therefore complies with paragraph 4 of Judge Baker's additional formatting requirements.

This brief was not prepared with the assistance of a generative artificial intelligence program.

Dated: August 22, 2025

/s/ Matthew R. Nicely
Matthew R. Nicely
AKIN GUMP STRAUSS
HAUER & FELD LLP

*Counsel to Shrimp Committee of the Vietnam Association of Seafood Exporters and Producers*