## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| **SHRIMP COMMITTEE OF THE VIETNAM ASSOCIATION OF SEAFOOD EXPORTERS AND PRODUCERS,** | |
| Plaintiff, | |
| v. | |
| **UNITED STATES,** | **Court No. 25-00032-MMB** |
| Defendant, | |
| and | |
| **AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,** | |
| Defendant-Intervenors. | |

## DEFENDANT-INTERVENOR AD HOC SHRIMP TRADE ACTION COMMITTEE'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Nathaniel Maandig Rickard
Zachary J. Walker
Anjelika D. Jani

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Ave., NW, Suite 700
Washington, DC 20036
(202) 331-5040

*Counsel to Ad Hoc Shrimp Trade Action Committee*

December 8, 2025

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................ iii

GLOSSARY ...................................................................................... iv

INTRODUCTION ............................................................................ 1

STATEMENT PURSUANT TO RULE 56.2(c) ................................ 1

    A.    Administrative Determination Under Review .............. 1

    B.    Issues Presented for Review and Summary of
         Argument ......................................................................... 2

STATEMENT OF FACTS ................................................................ 3

STANDARD OF REVIEW ............................................................... 6

ARGUMENT .................................................................................... 7

  I.    The Commission's Findings Regarding Its Pricing
       Analysis Were Supported by Substantial Evidence and
       Otherwise in Accordance with Law .................................... 7

    A.    Evidence on the Record Supports the Commission's
         Finding that there Was Significant Underselling by
         Subject Imports ............................................................... 8

    B.    Evidence on the Record Supports the Commission's
         Finding of Price Depression by Subject Imports ........ 14

  II.   The Commission's Findings Regarding the Negative
       Impact of Subject Imports on the Domestic Industry Were
       Supported by Substantial Evidence ................................... 18

  III.  The Commission Reasonably Determined that
       Competition Between Farm-Raised and Wild-Caught
       Shrimp Is Not Attenuated ................................................... 23

    A.    The Commission's Findings Regarding Attenuated
         Competition Were Supported by Substantial Evidence 23

    B.    The Commission's Decision to Reject Questionnaire
         Revision Requests Submitted by Plaintiff Was
         Reasonable ..................................................................... 27

CONCLUSION ..................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Altx, Inc. v. United States*,
   167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) ........................................ 13

*Citrosuco Paulista, S.A. v. United States*,
   704 F. Supp. 1075 (Ct. Int'l Trade 1988) ....................................... 7, 13

*Coal. of Gulf Shrimp Indus. v. United States*,
   71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ....................................... 10

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ............................................................................. 6

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ............................................................................. 6

*CS Wind Vietnam Co. v. United States*,
   832 F.3d 1367 (Fed. Cir. 2016) ........................................................... 7

*Full Member Subgroup of Am. Inst. of Steel Constr., LLC v. United
   States*, 81 F.4th 1242 (Fed. Cir. 2023) .............................................. 29

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997) ............................................................. 7

*Kenda Rubber Indus. Co. v. United States*,
   630 F. Supp. 354 (Ct. Int'l Trade 1986) ....................................... 12, 21

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ........................................................................... 13

*Mexichem Fluor Inc. v. United States*,
   179 F. Supp. 3d 1238 (Ct. Int'l Trade 2016) ................................. 12, 21

*Nitrogen Solutions Fair Trade Comm. v. United States*,
   358 F. Supp. 2d 1314 (Ct. Int'l Trade 2005) ................................. 12, 21

*U.S. Steel Grp. v. United States*,
   96 F.3d 1352 (Fed. Cir. 1996) ........................................................... 10

## Statutes

19 U.S.C. § 1516a(b)(1)(B) ..................................................................... 6
19 U.S.C. § 1677(4)(A) ................................................................... 11, 19
19 U.S.C. § 1677(7) ................................................................................. 7
19 U.S.C. § 1677(7)(C)(ii) ........................................................... 2, 8, 13
19 U.S.C. § 1677(7)(C)(ii)(II) ............................................................... 14
19 U.S.C. § 1677(7)(C)(iii) ................................................................... 18

**Regulations**

19 C.F.R. § 207.20(b) ...................................................................................29

**Administrative Determinations**

*Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, 88 Fed. Reg. 86,677 (Int'l Trade Comm'n Dec. 14, 2023) ...... 4

*Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, 89 Fed. Reg. 10,2163 (Int'l Trade Comm'n Dec. 17, 2024) .... 1

*Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. Nos. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024) ...................................................... passim

*Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. Nos. 701-TA-699-700 and 702 and 731-TA-1660 (Prelim), USITC Pub. 5482 (Dec. 2023)...................................................4

*Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 74,511 (Int'l Trade Comm'n Oct. 31, 2023)............................4

## GLOSSARY

| Acronym/Abbreviation | Definition |
| --- | --- |
| AHSTAC | Ad Hoc Shrimp Trade Action Committee |
| ASPA | American Shrimp Processors Association |
| Commerce | U.S. Department of Commerce |
| POI | Period of Investigation |

## INTRODUCTION

Defendant-Intervenor, the Ad Hoc Shrimp Trade Action Committee ("AHSTAC"), submits this response in opposition to the Rule 56.2 motion for judgement on the agency record filed by Plaintiff Shrimp Committee of the Vietnam Association of Seafood Exporters and Producers. *See* Pl. Mem. in Support of Mot. for J. on Agency R., (Aug. 22, 2025) ("Pl. Br."), ECF 40 (conf.), 39 (public).

For the reasons set forth below, AHSTAC respectfully requests that this Court deny Plaintiff's motions for judgment on the agency record and enter judgment for Defendant.

## STATEMENT PURSUANT TO RULE 56.2(C)

### A.     Administrative Determination Under Review

The determination under review is the final determination of the U.S. International Trade Commission (the "Commission") in the antidumping and countervailing duty investigations on frozen warmwater shrimp from Ecuador, India, Indonesia, and Vietnam. *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, 89 Fed. Reg. 10,2163 (Int'l Trade Comm'n Dec. 17, 2024). The determinations, findings, and conclusions challenged in this action are set out in the final Views of the Commission, *Frozen Warmwater*

*Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. Nos. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024) ("Final Views"), Appx1265-1353, and the final Staff Report, Commission Memorandum, "Staff Report," Inv. Nos. 701-TA-699-700, 702 and 731-TA-1660 (Final), (Nov. 7, 2024) ("Staff Report"), Appx1002-1264.

**B.    Issues Presented for Review and Summary of Argument**

    1.   *Whether the Commission's Findings Regarding Its Pricing Analysis Were Supported by Substantial Evidence and Otherwise in Accordance with Law*

Yes, the Commission conducted its price analysis in accordance with 19 U.S.C. § 1677(7)(C)(ii).  Contrary to Plaintiff's arguments, the agency's determination that subject imports significantly undersold the domestic like product and that subject imports depressed the domestic industry's prices was supported by substantial record evidence.

    2.   *Whether the Commission's Findings Regarding the Negative Impact of Subject Imports on the Domestic Industry Were Supported by Substantial Evidence*

Yes, the Commission reasonably conducted its impact analysis. Data collected from questionnaire responses and other evidence

submitted by interested parties support the Commission's finding that subject imports negatively impacted the domestic industry.

        3.    *Whether the Commission Reasonably Determined that Competition Between Farm-Raised and Wild-Caught Shrimp Is Not Attenuated*

Yes, the Commission reasonably determined that competition between farm-raised and wild-caught shrimp is not attenuated based on questionnaire data collected from U.S. processors, purchasers, and importers, and other evidence placed on the record by interested parties. The Commission's decision to reject Plaintiff's and other respondent interested parties' requests regarding revisions to the U.S. purchasers' questionnaire was also reasonable. The Commission explained that such revisions were either already reflected in the final version of the questionnaire or did not contribute to its pricing analysis.

## STATEMENT OF FACTS

On October 25, 2023, the American Shrimp Processors Association ("ASPA" or "Petitioner") filed petitions with the Commission and the U.S. Department of Commerce ("Commerce") for the imposition of antidumping duties on frozen warmwater shrimp from Ecuador and Indonesia, and for the imposition of countervailing duties on frozen warmwater shrimp from Ecuador, India, Indonesia, and Vietnam. *See*

Letter from Schagrin Associates to the Commission and Commerce, "Petitions for the Imposition of Antidumping and Countervailing Duties on Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam," (Oct. 25, 2023), Appx1709-10893. The agencies instituted antidumping and countervailing duty investigations accordingly. *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 74,511 (Int'l Trade Comm'n Oct. 31, 2023), Appx55070-55071.

On December 14, 2023, the Commission issued its preliminary affirmative determination where it found that the domestic industry was materially injured by reason of subject imports from the countries under investigation. *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, 88 Fed. Reg. 86,677 (Int'l Trade Comm'n Dec. 14, 2023); *Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. Nos. 701-TA-699-700 and 702 and 731-TA-1660 (Prelim), USITC Pub. 5482 (Dec. 2023), Appx21366-21413.

In advance of the final phase, the Commission provided draft questionnaires to interested parties and solicited comments to ensure

that the agency conducts a thorough analysis of data relevant to the investigation.  *See* Draft Final Phase Questionnaire Comment Letter, Appx56828.  Interested parties submitted comments accordingly.  The Commission considered these submissions and made changes to the questionnaires as necessary.  Finalized questionnaires were issued to U.S. processors, fishermen, importers, and purchasers, and foreign producers and exporters on June 26, 2024.  *See* Questionnaire Transmittal Letter, Appx57439.  Questionnaires were tailored to collect responses pertaining to the January 2021 to March 2024 period of investigation ("POI").

The Commission published the Final Views on December 13, 2024.  Final Views, Appx1265-1353.  While also addressing responses and other evidence that detracted from the agency's final determination, the Commission ultimately found that data collected from those questionnaires supported a finding that the domestic industry was materially injured by subject imports during the POI.  The Commission discussed these findings in detail in the Final Views.  *See generally* Final Views, Appx1265-1353.

Plaintiff thereafter commenced this appeal to challenge various aspects of the Commission's material injury finding. The Commission's brief thoroughly responded to these arguments and demonstrated that the agency's determination was supported by substantial evidence and otherwise in accordance with law. *See* Def. Mem. in Opposition to Pls. Mot. for J. on Agency R. (Nov. 24, 2025) ("Gov't Resp. Br."), ECF 45 (conf.), ECF 46 (public).

## STANDARD OF REVIEW

In reviewing the Commission's determinations, the Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence means such evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted). Under the substantial evidence standard, the agency is required to take into

account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997)).  Thus, the Court may not "substitute its own judgment for the Commission's or reweigh evidence on the record in reviewing the Commission's determination.  Rather, the Court must review the Commission's determination to establish whether it is supported by substantial evidence on the record." *Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1228 (Ct. Int'l Trade 1988).

## ARGUMENT

### I.   The Commission's Findings Regarding Its Pricing Analysis Were Supported by Substantial Evidence and Otherwise in Accordance with Law

To determine if the domestic industry is materially injured, the Commission must evaluate the factors provided in the statute.  19 U.S.C. § 1677(7).  Relevant here, the Commission must evaluate the price effects of subject imports by considering whether (1) "there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States," and (2) "the effect of imports of such merchandise otherwise depresses

prices to a significant degree or prevents price increases, which
otherwise would have occurred, to a significant degree." 19 U.S.C. §
1677(7)(C)(ii).

In the Final Views, the Commission determined that subject
imports had significant price effects on the domestic like product. Final
Views, Appx1331. Plaintiff disputed this finding, claiming that nothing
on the record supports such a conclusion that adverse price effects
occurred. *See* Pl. Br. at 24-47. As further explained below, these
arguments are without merit.

### A. Evidence on the Record Supports the Commission's Finding that there Was Significant Underselling by Subject Imports

Plaintiff argued that the Commission's underselling finding was
erroneous and must be remanded because "subject imports that were
purportedly undersold did not cause the domestic industry to lose
significant market share to subject imports." *Id*. at 28. This argument
is meritless.

Plaintiff appears to suggest that the Commission's findings were
made purely on the shift in market share over the POI. This is not true.
The Commission conducted a more thorough analysis by collecting

8

quarterly quantity and sales data on different frozen warmwater shrimp products to compare the prices of domestically produced products and subject imports and the volume of subject imports associated with underselling. *See* Final Views, Appx1317. *See also* Blank Questionnaire Templates, Appx57334-57336, Appx57403-57421. From this data, the Commission determined that "{s}ubject imports undersold domestically produced frozen warmwater shrimp in 141 of 214 (or 65.9 percent of) quarterly comparisons, with underselling margins ranging between 0.0 percent and 63.2 percent, and averaging 19.7 percent." Final Views, Appx1317. The Commission also collected lost sales data from purchasers, in which "{10} of the 20 responding purchasers reported that they had purchased subject imports instead of domestically produced product during the POI." *Id.*, Appx1318. The majority of these purchasers cited price as the primary factor in driving their purchasing decisions. *Id.*, Appx1318. Thus, the Commission was able to conclude from this information, and from questionnaire responses reporting "at least a moderate degree of substitutability between subject imports and the domestic like product, . . . that

cumulated subject imports significantly undersold the domestic like product during the POI." *Id.*, Appx1320.

This Court has held that the Commission's "chosen methodology" regarding its underselling analysis will be affirmed "so long as it is reasonable." *Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1365 (Ct. Int'l Trade 2015) (citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1361-1362 (Fed. Cir. 1996)).  In *Coal. Of Gulf Shrimp*, this Court "agree{d} with the {Commission} that its chosen methodology – relying on its questionnaire responses – was reasonable." *Id.* at 1366.  The Commission similarly relied on extensive data collected from questionnaire responses to make its determination in the underlying investigation.  Therefore, the Commission reasonably determined that subject imports undersold the domestic like product using a methodology approved by the courts, rather than solely relying on market share as Plaintiff's arguments imply.

Furthermore, Plaintiff argued that "{f}rom 2021 to the 2024 interim period, the domestic industry lost only 0.3 percentage points of market share."  Pl. Br. at 28.  As an initial matter, Plaintiff calculated this 0.3 percentage point loss by ignoring the fact that the domestic

industry was undisputably defined to include "all domestic harvesters of fresh warmwater shrimp and processors of frozen warmwater shrimp." Final Views, Appx1288-1289. Plaintiff argued that the Commission erred in combining market share to include fresh shrimp when "domestic production of frozen shrimp was more comparable to cumulated subject imports of frozen shrimp." Pl. Br. at 29. This led Plaintiff to calculate a 0.3 percentage point loss in market share by only using U.S. processor data. *See* Staff Report, Appx1117 (U.S. processors had 6.8 percent market share in 2021 and 6.5 percent market share in the 2024 interim period). The statute, however, requires the Commission to assess the domestic industry "<u>as a whole</u>." 19 U.S.C. § 1677(4)(A) (emphasis added). Thus, the statutory language requires the Commission to assess data pertaining to both processors and fishermen. *See id.*

Plaintiff further took issue with the agency's analysis because it addressed the three full years of the POI, rather than including the 2024 interim period. However, the Commission's analysis purposefully avoided comparing the interim period data to full year data because responding parties explained the effect of seasonality on U.S. demand.

Gov't Resp. Br. at 48.  *See also* Final Views, Appx1303-1304.  Where parties have challenged the timeframe of the Commission's analysis, this Court has held that "{t}he statute does not expressly command the Commission to examine a particular period of time." *Mexichem Fluor Inc. v. United States*, 179 F. Supp. 3d 1238, 1253 (Ct. Int'l Trade 2016) (quoting *Kenda Rubber Indus. Co. v. United States*, 630 F. Supp. 354, 359 (Ct. Int'l Trade 1986)).  *See also Nitrogen Solutions Fair Trade Comm. v. United States*, 358 F. Supp. 2d 1314, 1325 (Ct. Int'l Trade 2005) ("{T}he {Commission's} broad discretion in choosing the time frame for its investigation and analysis has consistently been upheld . . . .").

Thus, when properly combining fresh and frozen shrimp, the Commission determined that the domestic industry lost 0.8 percentage points of market share over the 2021 to 2023 period.  Final Views, Appx1320.

Regardless, Plaintiff later asserts that the domestic industry did not lose enough market share for underselling to be "significant" in accordance with the statute.  *See* Pl. Br. at 31.  They attempt to frame this argument as a question of statutory interpretation that would

require this Court to determine the meaning of "significant" under

*Loper Bright*. *See id.* at 31-32 ("'Congress expects courts to handle

technical statutory questions.' {*Loper Bright Enters. v. Raimondo*, 603

U.S. 369, 402 (2024)}. The Court is therefore empowered to read every

word in the statute and find that the change in the domestic industry's

market share was not significant.").

However, this Court has established that the Commission's

underselling analysis under 19 U.S.C. § 1677(7)(C)(ii) is fact specific.

*See Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1365 (Ct. Int'l

Trade 2001). The Court explained:

> The significance of underselling in an investigation will
> necessarily depend on the particulars of the product and
> industry at issue, not necessarily on the import of certain
> percentages understood in the abstract. To bind the
> Commission by such previous determinations on inherently
> fact-specific criteria would contradict the specific
> congressional mandate that "{t}he significance of the various
> factors affecting an industry will depend upon the facts of
> each particular case." S.Rep. No. 96–249, at 88 (1979). *See
> also Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196,
> 1209, 704 F. Supp. 1075, 1087–88 (1988) ("{T}he Commission's
> determinations must be based upon an independent
> evaluation of the factors with respect to the unique economic
> situation of each product and industry under investigation.").

*Id.* The Supreme Court made clear that *Loper Bright* does not disturb

the review standard for an agency's factual findings. *See Loper Bright*,

603 U.S. at 392. Therefore, the question before this Court is not to determine the meaning of "significant" in the context of the statute, but to consider whether the Commission's determination was supported by substantial evidence on the record.

Here, the Commission relied on questionnaire data on the record to determine that subject imports significantly undersold the domestic like product during the POI. The Commission further explained that underselling attributed to the domestic industry's loss in sales and market share during this period, which in turn, led to U.S. processors' and fishermen's declining financial performance. Final Views, Appx1338-1339. Thus, the Commission's determination was supported by substantial evidence and should be sustained by this Court.

### B. Evidence on the Record Supports the Commission's Finding of Price Depression by Subject Imports

The second prong of the Commission's price effects analysis requires the agency to determine whether pervasive underselling by subject imports led to price suppression or depression in the U.S. market to a significant degree. *See* 19 U.S.C. § 1677(7)(C)(ii)(II). Here, the Commission found that subject imports did, in fact, "depress{} prices for the domestic like product to a significant degree." Final Views,

14

Appx1328.  Plaintiff claims that the record does not support such a finding.  *See* Pl. Br. at 33-38.

As an initial matter, the Commission concluded that prices generally decreased over the POI.  Final Views, Appx1325; Staff Report, Appx1139.  While an increase in price occurred in 2021 and the first half of 2022, prices decreased for the rest of the POI.  *Id.*  The Commission also observed overall that "domestic price decreases ranged from 5.6 to 36.7 percent during January 2021 to March 2024 while subject import price decreases ranged from 0.6 to 40.2 percent."  Staff Report, Appx1139.  U.S. processors were forced to lower their prices to compete with low-priced subject imports, which resulted in processors lowering the price they paid fishermen.  Final Views, Appx1329.  The Commission further explained that the record indicates that "there is not a strong correlation between apparent U.S. consumption and the domestic industry's pricing trends.  Nor can declining costs explain the extent of the domestic industry's price declines."  *Id.*, Appx1328.  As a result, the Commission found that subject imports depressed prices to a significant degree.

However, Plaintiff continues to argue that the "timing of underselling and changes in market share further refutes the Commission's conclusion that underselling caused changes to the domestic industry's market share." Pl. Br. at 33. Plaintiff asserts that the time period where the domestic industry's prices would have been depressed by subject imports – 2022 to 2023 and interim 2024 – is contradicted by increased market share, operating income, and capital expenditures. *Id*. at 34-35. These arguments ignore record evidence.

First, as explained above, the record shows that the domestic industry lost 0.8 percentage points of market share when observing the full 2021 to 2023 time period. Staff Report, Appx1117. In the Final Views, the Commission further noted that this market share loss "was equivalent to over 10 percent of the domestic industry's 7.6 percent market share in 2021." Final Views, Appx1320.

Second, Plaintiff's claim that the domestic industry's operating income increased from 2022 to 2023 such that subject imports could not have adversely affected the industry is incorrect. Pl. Br. at 34. When considering the full 2021 to 2023 period, the data show that U.S. processors' and fishermen's operating income significantly worsened.

16

American fishermen went from an operating income of $8.1 million in 2021 to a loss of $1.8 million in 2023. Final Views, Appx1334; Staff Report, Appx1228. American shrimp processors similarly went from an operating income of $1.0 million in 2021 to a loss of $1.2 million in 2023. Final Views, Appx1337; Staff Report, Appx1228. While both segments of the industry experienced a slight recovery from 2022 to 2023, they were still operating with substantial losses compared to the positive incomes reported for 2021. *See* Staff Report, Appx1228.

Third, Plaintiff's claim that U.S. processors' increased capital expenditures were an indication that subject imports were not adversely affecting the industry is incorrect. Processors explained that efforts to make such investments were "hampered by competition from low-priced subject imports." Final Views, Appx1349. They further explained that a substantial number of processors were forced to "cancel, postpone, or scale back investment projects" because of the financial burden imposed on the industry by subject imports. *Id.*, Appx1349.

In sum, Plaintiff's claim that subject imports could not have depressed prices because the domestic industry did not experience

losses or significant changes is inconsistent with the record.  The
Commission reasonably determined that, "based on the pervasive
underselling by subject imports, . . . subject imports depressed domestic
prices to a significant degree."  Final Views, Appx1329.  Thus, the Court
should sustain the Commission's findings.

## II.    The Commission's Findings Regarding the Negative Impact of Subject Imports on the Domestic Industry Were Supported by Substantial Evidence

To determine if the domestic industry is materially injured by
subject imports, the Commission must also conduct an impact analysis
that considers "relevant economic factors which have a bearing on the
state of the industry," in accordance with 19 U.S.C. § 1677(7)(C)(iii).
The agency assessed these factors by collecting relevant questionnaire
data and other evidence and determined that the record supports a
finding that subject imports had a significant adverse impact on the
domestic industry.  Final Views, Appx1353.

Plaintiff disputes this determination, claiming that it was based
on "isolated tidbits of data" that wrongfully claim subject imports had
negatively impacted the domestic industry.  *See generally* Pl. Br. at 39-
47.  Yet Plaintiff continues to premise its arguments on the purported

"small" 0.3 percentage point loss in the domestic industry's market share over the POI. *Id.* at 40. As explained above, the Commission must conduct its analysis by considering the industry "as a whole," accounting for both U.S. processors and fishermen. *See* 19 U.S.C. § 1677(4)(A); Final Views, Appx1288-1289. Thus, while Plaintiff accuses the agency of cherry-picking data to support an affirmative material injury determination, *see* Pl. Br. at 39-40, 42, Plaintiff's arguments themselves focus on only one segment of the domestic industry to minimize the injury experienced by the domestic industry as a whole. The Commission found that the domestic industry suffered a 0.8 percentage point loss in market share over the POI, Final Views, Appx1320, but if the agency had instead relied upon the market share loss for both fresh and frozen shrimp from 2021 to interim 2024, the domestic industry suffered a 0.9 percentage point loss in market share (7.6 − 6.7), Staff Report, Appx1226. Although Plaintiff claims that this market share loss, however tabulated, is "small" (Pl. Br. at 40), these figures − whether 0.3 percent, 0.8 percent, 0.9 percent, or 1.0 percent − are all significant in the context of the domestic industry's total market share (7.6 percent) at the beginning of the POI. *Id.*

Next, Plaintiff disagreed with the Commission's finding that the domestic industry's injury was not caused by declining U.S. demand. Pl. Br. at 41-42.  Specifically, Plaintiff claims that "{s}everal factors indicate the domestic industry's performance improved relative to the 13.6 percentage point decline in apparent U.S. consumption during the POI" and that the agency "cherry-picked negative indicators as evidence" that subject imports injured the domestic industry.  *Id.*  These arguments are dismissive of the evidence demonstrating that the industry financially deteriorated over the 2021-2023 period.

For example, the reported net income of U.S. processors and fishermen significantly worsened from 2021 to 2023.  U.S. processors reported a net income of $18 million in 2021 and reported a net loss of $185,000 in 2023, and U.S. fishermen reported a net income of about $7 million in 2021 and reported a net loss of $2.7 million in 2023.  Final Views, Appx1334, Appx1337; Staff Report, Appx1228.

On the other hand, Plaintiff framed the domestic industry as being "well-positioned to compete in an increasing demand environment" because U.S. processors' sales and gross profit increased during the interim period when apparent U.S. consumption rebounded.

20

Pl. Br. at 41-42.  However, this requires the Commission to compare the interim period data to full year data while somehow accounting for skewed results due to seasonality in the industry.  *See id.* at 28-29 (arguing that Commission "was required to address the interim period in its analysis" because it allows for a "present injury determination"). The Commission explained in its brief that its reliance on full-year data is reasonable because it best captures the impact of subject imports on the industry's declining performance.  *See* Gov't Resp. Br. at 62-63 (explaining that the Commission also considered the seasonality of the U.S. market when comparing the three full years, rather than including the interim period).  *See also* Final Views, Appx1303.  As explained above, this Court has held that the Commission has broad discretion in choosing an appropriate time frame for its analysis.  *See Mexichem Fluor Inc.*, 179 F. Supp. 3d at 1253; *Kenda Rubber Indus. Co.*, 630 F. Supp. at 359; *Nitrogen Solutions Fair Trade Comm.*, 358 F. Supp. 2d at 1325.

Furthermore, Plaintiff identified capital expenditures as a factor where the domestic industry saw an increase of 26 percent from 2021 to 2023 during the POI.  Pl. Br. at 41.  *See also* Final Views, Appx1338.

However, Plaintiff ignored record evidence indicating that U.S. processors reported difficulties with carrying out these investments because of competition with subject imports.  Questionnaire data indicates that "a substantial number of responding U.S. processors reported that they had to cancel, postpone, or scale back investment projects."  Final Views, Appx1349.  The Commission also stated that "the record indicates that the domestic industry' {sic} efforts to make capital investments to increase its ability to produce value-added products were hampered by competition from low-priced subject imports."  *Id.*, Appx1349.

Lastly, the Commission observed that "market conditions improved somewhat for the domestic industry after Commerce imposed preliminary duties on imports of shrimp from the four subject countries in the spring of 2024."  *Id.*, Appx1339.  Specifically, post-POI data demonstrates that the volume of subject imports decreased by 14 percent from June to August 2024 as compared to the previous year, and U.S. pricing data experienced an uptick in July 2024 after a period of stability and further increased in October 2024.  *Id.*, Appx1339.  The Commission concluded that this data further supports its impact

analysis because it demonstrates that the domestic industry is able to

improve when the volume of subject imports declines in the U.S.

market. *See id.*, Appx1339; Gov't Resp. Br. at 64.

In sum, the Commission properly conducted its impact analysis,

and its findings are supported by substantial record evidence. As such,

this Court should sustain the agency's findings in the Final Views.

## III.   The Commission Reasonably Determined that Competition Between Farm-Raised and Wild-Caught Shrimp Is Not Attenuated

### A.   The Commission's Findings Regarding Attenuated Competition Were Supported by Substantial Evidence

In its final determination, the Commission concluded that it "{did}

not find that competition is attenuated between subject and

domestically produced frozen warmwater shrimp based on the

distinction between farm-raised and wild-caught shrimp," as the

respondents alleged during the investigation. Final Views, Appx1322.

Plaintiff continued to argue on appeal that the Commission's

determination is wrongly based on the conclusion that there is

interchangeability between the two products, and further stated that

"overwhelming record evidence that wild-caught and farm-raised

shrimp are not interchangeable should have been central to the

Commission's analysis regarding attenuated competition."  Pl. Br. at 49-51.  These arguments ignore the extensive analysis and record evidence relied upon by the Commission in the Final Views.

Based on responses from U.S. processors, purchasers, and importers, the agency generally found "at least a moderate degree of substitutability between domestically produced frozen warmwater shrimp and frozen warmwater shrimp imported from subject sources." Final Views, Appx1309.  Responding parties were also asked to specifically report on the interchangeability of farm-raised and wild-caught shrimp.  The Commission found that the majority of U.S. processors (14 out of 21) indicated that the products were always interchangeable, four indicated that the products were usually interchangeable, and only the remaining three responses indicated that they were never interchangeable.  Staff Report, Appx1041.

Despite Plaintiff's contention that detracting evidence was "glossed over" without explanation, Pl. Br. at 51-52, the Commission acknowledged that a majority of importers and purchasers stated that farm-raised and wild-caught shrimp was limited in interchangeability. *See* Final Views, Appx1311-1312, Appx1321-1322; Staff Report,

24

Appx1041.  The agency continued to explain that other evidence on the record still supports a finding that the products are interchangeable. For example, U.S. processors stated that "frozen warmwater shrimp is frequently marketed and sold in ways that downplay the distinctions between domestic wild-caught shrimp and imported farm-raised shrimp, <u>which inhibits purchasing decisions on that basis and elevates distinctions in prices</u>."  Final Views, Appx1321 (emphasis added).  They further explained that "retailers and consumers often do not know whether they have purchased wild-caught shrimp or farm-raised shrimp, and simply request shrimp without regard to its origin," which indicates interchangeability between the two products.  *Id.*, Appx1321. *See also id.*, Appx1311 (explaining that restaurants purchase imported farm-raised shrimp despite giving the impression that their customers may be served domestic wild-caught shrimp).

Furthermore, the record includes lost sales and lost revenue data demonstrating that U.S. processors experienced losses due to direct competition with subject imports, which the agency incorporated into its interchangeability analysis.  *See id.*, Appx1321; Staff Report, Appx1142. As the Commission noted in its brief, despite characterizing the agency

as selectively relying upon some record evidence while disregarding other record evidence, Plaintiff entirely ignores this evidence.  *See* Gov't Resp. Br. at 85.  The agency concluded from this data that purchasers purchased a significant volume of subject imports over domestic products, with many purchasers reporting that price was the primary factor in driving their purchasing decision.  Staff Report, Appx1142.

Additionally, Plaintiff argued that the agency did not explain why comparability regarding non-price related factors supports its conclusion that subject imports and domestic products are interchangeable when "purchasers have different standards for wild-caught and farm-raised shrimp."  Pl. Br. at 57.  Plaintiff cited the experiences of one large, commercial retailer, but the record does not demonstrate that any such standards are required by other responding purchasers.  *See id*.  The Commission rebutted these arguments in detail in its brief.  *See* Gov't Resp. Br. at 85-86.  The Commission also collected data during the underlying investigation that clearly shows that "half or more of responding purchasers reported that domestic product was comparable" to products from subject countries.  Staff Report, Appx1044.  *See id*. Appx1045-1049.

In sum, Plaintiff made baseless arguments concerning the validity of the Commission's finding regarding attenuated competition and the record evidence relied upon. The Commission's findings were reasonable and supported by substantial evidence and should be sustained by this Court.

**B.    The Commission's Decision to Reject Questionnaire Revision Requests Submitted by Plaintiff Was Reasonable**

During the underlying investigation, Plaintiff urged the Commission to revise its purchaser questionnaire to include certain non-price factors, to which the Commission declined to incorporate. Pl. Br. at 61. In the instant review, Plaintiff argued that the agency's "unwillingness" to incorporate these revisions, and revisions proposed by the Ecuadorian respondents to include black tiger shrimp and other products as additional pricing products, contributed to the agency's inability "to assess the level of attenuated competition between foreign and domestic merchandise." *Id.* These arguments are without merit.

First, the Commission explained in its brief in detail that it actually revised its questionnaire to require responding companies to report certain non-price factors in two different questions. *See* Gov't

Resp. Br. at 102-103; Blank U.S. Purchasers' Questionnaire (Final),
Appx57282, Appx57288-57289.  The agency explained that Plaintiff's
remaining request asks for those factors to be added to a general
question about non-price related purchasing decisions, but the
Commission declined since that information was already being collected
elsewhere.  Gov't Resp. Br. at 103.

Second, the Commission rejected the Ecuadorian respondents'
request to include additional pricing products, such as black tiger
shrimp, because the products were "'niche' products, produced
domestically in only small quantities, or else ill-defined."  Final Views,
Appx1317-1318.  The Commission further explained that "{t}he goal of
the Commission's pricing data is to capture head-to-head competition
between the domestic like product and subject imports, and thus
including products for which there is limited domestic production would
undermine this goal."  *Id.*, Appx1318.  In other words, the agency
declined to collect this information because collection of the requested
information was unlikely to usefully contribute to the Commission's
analysis.

The U.S. Court of Appeal for the Federal Circuit has recognized:

Once the Commission satisfies its obligation to conduct investigative activities under 19 C.F.R. § 207.20(b), a decision not to collect additional information does not alone render the Commission's final determination unsupported by substantial evidence. "The Commission does indeed enjoy discretion to conduct its investigation and gather data it deems relevant." But "{t}here is no statutorily designated minimum standard that requires a particular degree of thoroughness in the Commission's investigation." Moreover, "{i}t is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew."

*Full Member Subgroup of Am. Inst. of Steel Constr., LLC v. United States*, 81 F.4th 1242, 1257-1258 (Fed. Cir. 2023) (internal citations omitted). Here, the Commission reasonably declined to incorporate Plaintiff's and other parties' suggested revisions to the questionnaires. Therefore, AHSTAC respectfully requests that this Court sustain the agency's decision.

## **CONCLUSION**

For the foregoing reasons, AHSTAC respectfully requests that this Court sustain the determinations, findings, and conclusions challenged by Plaintiff in this appeal.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Nathaniel Maandig Rickard

Nathaniel Maandig Rickard
Zachary J. Walker
Anjelika D. Jani

</div>

29

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Ave., NW
Suite 700
Washington, DC 20036
(202) 331-5040

*Counsel to Ad Hoc Shrimp Trade
Action Committee*

Dated: December 8, 2025

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this brief complies with the 7,000 word-count limitation set in the Court's June 5, 2025 scheduling order. Specifically, this brief contains 5,222 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and counsel's signature block.

The undersigned counsel further certifies that this brief was not prepared with the assistance of any generative artificial intelligence program.

Respectfully submitted,

*/s/ Nathaniel Maandig Rickard*
Nathaniel Maandig Rickard

**PICARD KENTZ & ROWE LLP**
*Counsel to Ad Hoc Shrimp Trade Action Committee*

Dated: December 8, 2025