*NON-CONFIDENTIAL DOCUMENT*

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS, C.A.,<br>    *Plaintiffs,*<br><br>v.<br><br>UNITED STATES,<br>    *Defendant,*<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>    *Defendant-Intervenors.* | No. 25-00029-MMB |
| SEAFOOD EXPORTERS ASSOCIATION OF INDIA,<br>    *Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br>    *Defendant,*<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>    *Defendant-Intervenors.* | No. 25-00031-MMB |

*NON-CONFIDENTIAL DOCUMENT*

VIETNAM ASSOCIATION OF SEAFOOD
EXPORTERS AND PRODUCERS,
*Plaintiff,*

v.                                                                      No. 25-00032-MMB

UNITED STATES,
                              *Defendant,*

and

AD HOC SHRIMP TRADE ACTION
COMMITTEE and AMERICAN SHRIMP
PROCESSORS ASSOCIATION,
                              *Defendant-Intervenors.*

## DEFENDANT-INTERVENOR AMERICAN SHRIMP PROCESSORS ASSOCIATION MEMORANDUM IN OPPOSITION TO MOTIONS OF PLAINTIFFS FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
Elizabeth J. Drake
Nicholas C. Phillips*
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, D.C.  20001
(202) 223-1700
rschagrin@schagrinassociates.com
*Counsel for ASPA*
*Admitted only in New York. Practice limited
to matters before federal courts and agencies.

Dated: December 8, 2025

*NON-CONFIDENTIAL DOCUMENT*

# TABLE OF CONTENTS

**I.   STATEMENT PURSUANT TO RULE 56.2** ..................................... 2

   **A.   Administrative Determinations under Review** ................... 2

   **B.   Issues Presented and Summary of Argument** ...................... 3

**II.   STATEMENT OF FACTS** ................................................... 3

**III.   ARGUMENT** ........................................................... 4

   **A.   Standard of Review** .................................................. 4

   **B.   Additional Argument** ................................................ 4

     1.   The Commission Properly Included Frozen Raw Shrimp and Frozen Cooked Shrimp in the Same Domestic Like Product ............. 4

     2.   The Commission's Volume Determination Was Reasonable ....... 7

     3.   The Commission Reasonably Found Adverse Price Effects ......... 8

     4.   The Commission Reasonably Found Imports Had a Significant Adverse Impact ......................................................... 9

     5.   The Commission Reasonably found Supply Constraints Could Not Explain the Injury the Domestic Industry Suffered .................. 10

     6.   The Commission Reasonably Found that Competition Was Not Attenuated ............................................................. 14

     7.   The Commission Reasonably Found Injury to the Fishing Segment of the Industry ................................................. 17

**IV.   CONCLUSION** ....................................................... 20

i

*NON-CONFIDENTIAL DOCUMENT*

## <u>TABLE OF AUTHORITIES</u>

**Other Authorities**

*Frozen Warmwater Shrimp from Brazil, China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1064 and 1066-1068, USITC Pub. 4688 (Second Review) (May 2017) ........................................................11

*Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1064 and 1066-1068 (Third Review), USITC Pub. 5432 (June 2023) ..................................................................11

*Certain Frozen or Canned Warmwater Shrimp and Prawns from Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1068 (Final), USITC Pub. 3748 (Jan. 2005).............................6 - 7

*NON-CONFIDENTIAL DOCUMENT*

## <u>GLOSSARY</u>

| Term | Definition |
|------|------------|
| ASPA | American Shrimp Processors Association |
| Commission | U.S. International Trade Commission |
| POI | Period of investigation |

*NON-CONFIDENTIAL DOCUMENT*

Defendant-Intervenor, the American Shrimp Processors Association ("ASPA"), opposes the Motions for Judgment on the Agency Record filed by the following groups of plaintiffs: (1) Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional de Galapagos, C.A. ("Ecuadorian Respondents") in Case No. 25-00029; (2) Seafood Exporters Association of India ("Indian Respondents") in Case No. 25-00031, and (3) Shrimp Committee of the Vietnam Association of Seafood Exporters and Producers ("Vietnamese Respondents") in Case No. 25-00032. While the Court's scheduling order permits Defendant-Intervenor to file a separate response brief in the Vietnam appeal (Case No. 25-00032), for efficiency's sake we are filing one consolidated response brief in all three appeals. *See* Rule 56.2 Notice (June 5, 2025), Ct. No. 1:25-cv-00029-MMB (ECF. No. 33), Ct. No. 1:25-cv-00031-MMB (ECF No. 31), and Ct. No. 1:25-00032-MMB (ECF No. 35) (hereinafter "Rule 56.2 Notice").

As reviewed in more detail below, the final determinations of the United States International Trade Commission ("the Commission") in the countervailing duty investigations on imports of frozen warmwater shrimp from Ecuador, India, and Vietnam are supported by substantial

evidence and in accordance with law. This Court should therefore affirm the final determinations in their entirety.

Defendant-Intervenor concurs with and hereby endorses and incorporates by reference the arguments made by Defendant in its response brief. Defendant's Public Response in Opposition to Motion for Judgment on the Agency Record (Nov. 24, 2025), Ct. No. 1:25-cv-00029-MMB (ECF. No. 42), Ct. No. 1:25-cv-00031-MMB (ECF No. 41), and Ct. No. 1:25-00032-MMB (ECF No. 46) (hereinafter "Def. Resp."). Consistent with the instructions in the Court's Rule 56.2 notices to avoid the repetition of arguments in earlier-filed briefs, we focus below on highlighting a few additional points that further support sustaining the Commission's determination.

## I.    STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Determinations under Review

Plaintiffs seek review of the Commission's affirmative determinations in the countervailing duty investigations of frozen warmwater shrimp from Ecuador, India, and Vietnam. Notice of the determinations was published in the *Federal Register* on December 17, 2024. Appx1354. The Commission's Views for these investigations are

*NON-CONFIDENTIAL DOCUMENT*

contained in *Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. No. 701-TA-699-700 and 702 and 731-TA-1660 (Final), USITC Pub. 5566 (Dec. 2024), Appx1355-Appx1708.[1]

### B. Issues Presented and Summary of Argument

Defendant-Intervenor hereby incorporates by reference and endorses the statements of the United States regarding the issues presented and summary of argument contained in the Response Brief of the United States. Def. Resp. at 2 – 13. In addition, Defendant-Intervenor highlights certain other relevant considerations supporting the Commission's determinations in the Argument section, below.

## II.    STATEMENT OF FACTS

Defendant-Intervenor hereby incorporates by reference and endorses the statement of facts contained in the Response Brief of the United States. Def. Resp. at 13 – 23.

---

[1] Citations to the Commission's confidential views ("Views") are to Appx1265-Appx1353 and citations to the confidential staff report ("CSR") are to Appx1000-Appx1264.

*NON-CONFIDENTIAL DOCUMENT*

## III.  ARGUMENT

### A. Standard of Review

Defendant-Intervenor hereby incorporates the Defendant's statement of the standard of review by reference. Def. Resp. at 23 – 26.

### B. Additional Argument

As noted above, Defendant-Intervenor concurs with and hereby endorses and incorporates by reference the arguments made by Defendant in its response brief. We focus below on highlighting a few additional points that further support sustaining the Commission's determination.

1. <u>The Commission Properly Included Frozen Raw Shrimp and Frozen Cooked Shrimp in the Same Domestic Like Product</u>

As noted by the Defendant, each of the six traditional like product factors supported the Commission's determination that frozen raw shrimp and frozen cooked shrimp are part of the same domestic like product, due to a lack of clear dividing lines between the two.

Regarding channels of distribution, Defendant correctly notes that frozen raw shrimp and frozen cooked shrimp are marketed side-by-side to the same consumers, by the same retailers, in near-identical

4

*NON-CONFIDENTIAL DOCUMENT*

packaging. Def. Resp. at 31. Indeed, information submitted by ASPA demonstrated that when consumers browse frozen raw shrimp on websites for grocery-delivery services, the first "similar item" shown is frozen cooked shrimp. Appx45255, Appx45302, Appx45433-045435 (ASPA Posthearing Brief, Answers to Questions at 29, Exh. 12). In addition, Indian respondents' own testimony also contradicts the claim that cooked frozen shrimp is absent from the restaurant or food service channels.  At the Commission's hearing, a witness for Indian respondents testified that frozen cooked shrimp are also sold to restaurants and used to prepare dishes including "shrimp cocktail, or as part of a seafood platter, or perhaps even as an entrée add-on." Appx58441-Appx58442 (Hr'g Tr. at 171 and 172 (Atluri)).

Defendant also correctly notes that the facts underlying the Commission's determination to treat canned warmwater shrimp as a separate domestic like product than frozen warmwater shrimp in a prior 2005 proceeding is both not controlling and also readily distinguishable on the facts. Def. Resp. at 36 – 37.

While canned warmwater shrimp is never subjected to a freezing process, both raw frozen shrimp and cooked frozen shrimp are produced

*NON-CONFIDENTIAL DOCUMENT*

through the same freezing process. Thus, the same freezing equipment and methods are used on both raw and cooked frozen warmwater shrimp, while canned warmwater shrimp is produced on separate equipment and through a separate process. *See* U.S. International Trade Commission, Certain Frozen or Canned Warmwater Shrimp and Prawns *from Brazil, China, Ecuador, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1068 (Final), USITC Pub. 3748 (Jan. 2005) (hereinafter "*Shrimp 2005 ITC Final*") at 8 – 10.

In its prior 2005 determination, the Commission also noted other important differences in physical characteristics between canned and frozen shrimp, including packaging (i.e., a shelf-stable can that is not refrigerated or frozen) and the much smaller size of the shrimp used in canning. *See id*. at 10. Here, by contrast, both raw and cooked frozen warmwater shrimp are available in the same count sizes and product forms, and the same packaging. Appx1278, Appx1280-Appx1281.

The overlap in product sizes and forms between raw and cooked frozen warmwater shrimp means that both forms can be used in the same meal preparations and as "center-of-the-plate" items, making them fully interchangeable. *Id*. Canned shrimp, by contrast, due to

*NON-CONFIDENTIAL DOCUMENT*

their smaller size, are instead used as one of several ingredients in a dish, such as a shrimp salad. *Shrimp 2005 ITC Final* at 9.

For all of these reasons, the Court should affirm the Commission's determination that cooked frozen shrimp and raw frozen shrimp are part of the same domestic like product.

2. <u>The Commission's Volume Determination Was Reasonable</u>

As noted by Defendant, the record did not support Indian respondents' contention that subject imports satisfied demand that the domestic industry was not able to supply. Def. Resp. at 43 – 44. In addition to the lack of supply constraints cited by domestic fishermen and processors, the record showed that domestic producers' loss of market share to subject imports forced them to curtail production and shipments at a much faster pace than the decline in demand. Appx1226-Appx1228. As a result, the domestic processing industry's already low capacity utilization rate of 47.2 percent in 2022 fell to just 36.9 percent in 2024. *Id*. In addition, the domestic industry was saddled with ever-growing inventories, which ballooned by 69.7 percent from 2021 to 2023. *Id*. Indeed, by 2023, domestic processors were forced to add more than a third of the shrimp they produced to their swelling

*NON-CONFIDENTIAL DOCUMENT*

inventories instead of selling it their customers, as sales were lost to subject imports. *Id*. All of these facts directly refute any contention that the domestic industry would have been able to supply more demand but for the overwhelming presence of large volumes of subject imports. The lack of supply constraints is only underscored by the fact that the domestic industry was able to quickly ramp up production and shipments in interim 2024, after the petitions were filed. *Id*.

### 3. The Commission Reasonably Found Adverse Price Effects

As the Defendant correctly notes, the finding of significant underselling was not based on a market share shift, though lost sales to lower priced imports did contribute to a gain of 5.2 percentage points of subject market share by subject imports, while the domestic industry lost 0.8 percentage points of market share, leading to declines in production, capacity utilization, shipments, and profitability. Def. Br. at 46 – 47. As such, even the loss of 0.8 percentage points of market share to subject imports was significant in the context of these investigations. The domestic industry's market share at the beginning of the period of investigation ("POI") was only 7.6 percent, and the decline to 6.8 percent contributed to the loss of 276.5 million pounds of domestic

*NON-CONFIDENTIAL DOCUMENT*

shipments from 2021 to 2023, a decline of 39.5 percent. Appx1226-
Appx1228. Thus, Vietnamese respondents' characterization of the loss
of 0.8 percentage points as insignificant ignores the fact that the
domestic industry was already only barely able to hold on in a market
dominated by low-priced imports at the beginning of the POI, and that
position became even more tenuous due to widespread underselling
throughout the period.

4. The Commission Reasonably Found Imports Had a
   Significant Adverse Impact

As noted by Defendant, lost volume and declining prices caused by
low-priced imports erased the domestic industry's profitability over the
POI, both for processors and for fishermen. Appx1226-Appx1228. As a
result, both segments suffered significant losses in both 2022 and 2023.
*Id.* From 2021 to 2023, the processing segment of the industry lost more
than $250 million in annual revenue, *id.*, a staggering amount for an
industry comprised of small, family-owned businesses. As a result,
fishing effort declined, boats were being tied up all over the Gulf and
South Atlantic, and the industry was on the verge of collapse. *See*
Appx1341 (text & n.298), Appx1347 (text & nn.323-24), Appx58312
(Hr'g Tr. at 42 (Garcia)), Appx58315 (Hr'g Tr. at 45 (Tran)), Appx58302

*NON-CONFIDENTIAL DOCUMENT*

(Hr'g Tr. at 32 (Gibson)). The Vietnamese respondents' insistence that the domestic industry's performance was "strong" simply ignores the overwhelming evidence to the contrary – evidence that the entire domestic industry was severely injured due to the massive volumes of low-priced imports dominating the market.

For all of these reasons, the Court should affirm the Commission's adverse impact determination.

      5.  <u>The Commission Reasonably found Supply Constraints Could Not Explain the Injury the Domestic Industry Suffered</u>

As reviewed in Section III.B.2, above, the record did not support respondents' claims that the subject imports' gain in market share over the POI was due to domestic industry supply constraints. While it is true that the domestic industry may not be able to supply all of domestic consumption, there is no such requirement in the statute. Moreover, the record supported the conclusion that the domestic industry could have supplied greater volumes in the absence of underselling and price depression that caused domestic producers to lose market share and prevented processors from paying dockside prices justifying the boats' fishing effort. *See* Def. Resp. at 67 – 70. The boats

10

*NON-CONFIDENTIAL DOCUMENT*

that stopped fishing during the POI did not tie up because there were no shrimp to harvest – they tied up because low-priced imports made it economically impossible to profitably harvest shrimp. The Commission has repeatedly, and correctly, found that a decline in prices lowers the incentive to harvest warmwater shrimp. *See Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1064 and 1066-1068 (Third Review), USITC Pub. 5432 (June 2023) at 79 – 80 ("While wild catch landings have never come close to meeting total apparent U.S. consumption in these reviews and the prior proceedings, respondents' arguments overlook our finding above that the overall domestic supply of shrimp also turns on the economic incentive for fishermen to harvest shrimp, such that high fuel costs and low dockside prices can also disincentivize fishermen from engaging in shrimping activities."). *See also Frozen Warmwater Shrimp from Brazil, China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1063-1064 and 1066-1068, USITC Pub. 4688 (Second Review) (May 2017) at 54 ("We find that overall the domestic supply of shrimp turns in large part on the incentive for fishermen to harvest shrimp, and that fuel costs and low

*NON-CONFIDENTIAL DOCUMENT*

prices can serve as a disincentive to fishermen to take their boats out to harvest shrimp.").

In light of these facts, Indian respondents commissioned a report by ION Economics purporting to show a lack of correlation between imports and the volume of domestic production. As noted by Defendant, the report had several methodological limitations given the incomplete data sources, limited regression methodology, and failure to account for periods preceding the flooding of the U.S. market by farmed shrimp imports. Def. Br. at 70 – 72.

The regression methodology, for example, claims to show no relationship between domestic landings and ex-vessel prices, and a separate simple regression purportedly shows no relationship between domestic landings and diesel prices. Appx45255, Appx45287 (ASPA Posthearing Brief, Answers to Questions at 14). Diesel prices, however, may impact both domestic landings and ex-vessel prices, rendering a simple regression of the latter two variables without controlling for the first variable misleading and incomplete. *Id*. ION failed to perform a multiple regression analysis that could have controlled for the many factors that simultaneously affect both the independent and dependent

*NON-CONFIDENTIAL DOCUMENT*

variables, and thus the Commission correctly found its methodology flawed.

As noted by the Defendant, even the ION report's own data showed significant fluctuations in landings from year to year, rather than any fixed biological limit on supply as respondents claimed. Def. Resp. at $72 - 73$. Yet even these fluctuations understate the ability of the domestic industry to increase supply in the absence of unfair import competition. For the entire time period the ION Report measures, imports maintained a commanding presence in the U.S. market. This renders the report incapable of supporting its conclusion that domestic volumes are entirely determined by biological and ecological factors. Commissioner Kearns understood this problem, and hypothesized that domestic volumes may have been larger in prior decades before imported shrimp entered the U.S. market in significant quantities. Appx58513-Appx58514 (Hr'g Tr. at $243 - 244$ (Kearns)). Indeed, the historical data show that landings ranged from 179.3 million pounds in 1981 to 141.5 million pounds in 1983, before the surge imports of farmed shrimp into the U.S. market, and other data showed that the industry regularly exceeded 200 million pounds in annual landings

*NON-CONFIDENTIAL DOCUMENT*

between 1950 and the late 1970's. Appx45255, Appx45288-Appx45289 (ASPA Posthearing Brief, Answers to Questions at 15 – 16). These totals are substantially greater than the landings of 128.0 to 115.0 million pounds realized during the POI. These facts undermined respondents' claims that the levels of landings reflected in the ION Report represented the maximum natural supply of shrimp available in the Gulf and South Atlantic.

The Court should therefore affirm the Commission's determination that supply constraints could not explain the injury the domestic industry suffered during the POI.

6.  <u>The Commission Reasonably Found that Competition Was Not Attenuated</u>

The Defendant correctly explains the facts that supported the Commission's determination that there is at least a moderate degree of substitutability between domestic and imported shrimp despite differences in the degree to which they are produced from wild capture versus aquaculture. Def. Resp. at 77 – 79. In addition to the fact that most purchasers reported that they and their customers never or only sometimes make purchasing decisions based on the producer or country

*NON-CONFIDENTIAL DOCUMENT*

of origin, Appx1038, whether shrimp was wild-caught or farmed did not rise to the level of a top purchasing factor, Appx1039. Physically identical farmed and wild-caught shrimp are often marketed side-by-side, with farmed shrimp often bearing symbols associated with oceans and boats despite not being wild-caught, and the American flag despite being imported. Appx45255, Appx45296-Appx45297, Appx45381-Appx45386 (ASPA Posthearing Brief, Answers to Questions at 23 – 24, Exhs. 6 and 7). Indeed, restaurants and retailers are so eager to present wild-caught American shrimp and farm-raised imported shrimp as interchangeable that they have discouraged domestic processors from pursuing efforts to distinguish their product. Appx58297-Appx58298, Appx58355-Appx58358 (Hr'g Tr. at 27-28 and 85 (Gollott), 86-87 (Pearson), and 88 (Antley)).

It is precisely because of the high degree of substitutability between domestic and imported product that price is such an important factor in purchasing decisions for frozen warmwater shrimp. Price was rated by purchasers as one of the top three purchasing factors for shrimp, 70 percent of purchasers reported that price was a very important factor in their purchasing decisions, and 15 out of 20

purchasers report that they sometimes, usually, or always buy the lowest priced product. Appx1039-Appx1040. The importance of price in purchasing decisions belies respondents' claims that competition was attenuated between wild-caught and farm-raised shrimp.

The testimony of domestic processors further underscored the direct, head-to-head competition between domestic and imported product based on price. As Mr. Pearson, President of JBS Packing Company, Inc., stated at the Commission's hearing: "{A}s a direct competitor, do our customers say, hey you need to be at this price because this is what we get imports for? Every day. There's no question about that." Appx58356 (Hr'g Tr. at 86 (Pearson)). Mr. Antley, Vice President of Operations for Wood's Fisheries, also shared an experience regarding a purchaser "who basically said {the requested shrimp product} needs to be below $5 and if you can't do that we have to go with imported shrimp." Appx58358 (Hr'g Tr. at 88 (Antley)).

In short, the record evidence supported the Commission's determination that there is direct, and not attenuated, competition between imported and domestic shrimp, allowing large volumes of low-priced imports to take sales and market share from domestic producers,

*NON-CONFIDENTIAL DOCUMENT*

drive down prices, and cause material injury. For all of these reasons, the Court should affirm the Commission's determination that competition between wild-caught domestic shrimp and imported farm-raised shrimp is not so attenuated as to break the causal link between large volumes of low-priced imports and material injury to the domestic industry.

    7.  <u>The Commission Reasonably Found Injury to the Fishing Segment of the Industry</u>

Fishermen also suffered material injury as imports took market share, undersold domestic producers, and suppressed and depressed prices. As the Defendant correctly explains, the injury caused to the fishing segment of the industry cannot be attributed solely to fuel prices during the POI, as those prices started declining in June of 2022 and fell over the POI as a whole, even as fishermen's financial performance deteriorated sharply. Def. Resp. at 88 – 90. Regardless of trends in fuel prices, the average unit value of fishermen's sales fell in each period, plummeting by 42.6 percent overall from 2021 to 2023. Appx1226-Appx1228. There was simply no way for fishermen to pass along rising

*NON-CONFIDENTIAL DOCUMENT*

fuel costs, or benefit from falling fuel prices, when shrimp prices were so pervasively undercut by imports and fell precipitously.

Material injury to the fishermen is evident in other data for this segment of the industry. From 2021 to 2023, fishermen's net sales quantities fell by 2.7 percent, but a much steeper decline in unit values slashed sales revenue nearly in half. *Id*. As average unit values fell, fishermen tried to cut operating expenses to remain viable, but there was no way to keep pace with the crash in dockside prices. As a result, the fishing industry's operating income margin fell from 6.7 percent in 2021 to growing losses of negative 2.0 percent in 2022 and negative 2.3 percent in 2023. *Id*. Net income and net income margins also fell. Indeed, as noted above, prices fell so low that fishermen were forced to reduce fishing effort and tie up their boats, resulting in fewer landings. Witnesses testified that up to half of the fleet were sitting idle in different parts of the Gulf due to low prices. Appx58302, Appx58311, Appx58315 (Hr'g Tr. at 32 (Mr. Gibson), 41 (Mr. Garcia), and 45 (Mr. Tran)).

In short, both the processing and fishing segments of the domestic industry were severely harmed by large volumes of low-priced

*NON-CONFIDENTIAL DOCUMENT*

imports that took market share and depressed prices over the POI. Processors need a healthy fishing fleet that has the economic incentive to catch shrimp, and fishermen need a healthy processing segment to process their harvest and take it to market. When large volumes of imports depress prices to such a degree that processors cannot earn a profit, and processors cannot afford to pay the boats what they need to justify their fishing effort, the industry begins to collapse. This is exactly what occurred during the POI, and the Commission thus properly found that the industry as a whole was materially injured by reason of subject imports.

For all of these reasons, the Court should uphold the Commission's affirmative injury determination.

*NON-CONFIDENTIAL DOCUMENT*

## IV. CONCLUSION

For the foregoing reasons, Defendant-Intervenor respectfully requests that the Court deny the plaintiffs' Motions for Judgment on the Agency Record and sustain the Commission's final determination in its entirety as supported by substantial evidence and in accordance with law.

Respectfully Submitted,

<u>/s/ Roger B. Schagrin</u>
Roger B. Schagrin
Elizabeth J. Drake
Nicholas C. Phillips*
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, D.C.  20001
(202) 223-1700
*Counsel for ASPA*
*Admitted only in New York.
Practice limited to matters before
federal courts and agencies.

Dated: December 8, 2025

*NON-CONFIDENTIAL DOCUMENT*

## <u>CERTIFICATE OF COMPLIANCE WITH FORMATTING AND WORD COUNT LIMITATIONS</u>

I hereby certify that the foregoing response brief contains 3,434 words and therefore complies with the word limitation set forth in the Rule 56.2 Notice for these cases. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief. This brief was prepared according to the type setting and formatting requirements as set forth in the CIT Rules, Chambers Procedures, and Judge Baker's Individual Practice Rules for the preparation of briefs.

Dated: December 8, 2025                    <u>/s/ Elizabeth J. Drake</u>
                                            Elizabeth J. Drake

*NON-CONFIDENTIAL DOCUMENT*

## <u>CERTIFICATE OF COMPLIANCE WITH CONFIDENTIALITY AND ARTIFICAL INTELLIGENCE RULES</u>

I hereby certify that the foregoing response brief contains no words or numbers designated as confidential. I further certify that this brief was not prepared with the assistance of a generative artificial intelligence program.

Dated: December 8, 2025                    <u>/s/ Elizabeth J. Drake</u>
                                           Elizabeth J. Drake

*NON-CONFIDENTIAL DOCUMENT*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, December 8, 2025, I provided true and correct copies of the foregoing response brief to all counsel of record via filing with the Court's CM/ECF system. I further certify that courtesy copies will be provided consistent with the Court's instructions.

Dated: December 8, 2025                    <u>/s/ Elizabeth J. Drake</u>
                                            Elizabeth J. Drake

*NON-CONFIDENTIAL DOCUMENT*

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS, C.A.,<br>       *Plaintiffs,*<br><br>v.<br><br>UNITED STATES,<br>       *Defendant,*<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>       *Defendant-Intervenors.* | No. 25-00029-MMB |
| SEAFOOD EXPORTERS ASSOCIATION OF INDIA,<br>       *Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br>       *Defendant,*<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>       *Defendant-Intervenors.* | No. 25-00031-MMB |

*NON-CONFIDENTIAL DOCUMENT*

| | |
|---|---|
| VIETNAM ASSOCIATION OF SEAFOOD EXPORTERS AND PRODUCERS,<br>     *Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br>     *Defendant,*<br><br>and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br>     *Defendant-Intervenors.* | No. 25-00032-MMB |

## **PROPOSED ORDER**

Upon consideration of the Rule 56.2 motions for judgment on the agency record filed by Plaintiffs Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional De Galapagos C.A. in Case No. 1:25-cv-00029-MMB, by Plaintiff Seafood Exporters Association of India in Case No. 1:25-cv-00031-MMB, and by Plaintiff Vietnam Association of Seafood Exporters and Producers in Case No. 1:25-cv-00032-MMB, and upon consideration of the responses thereto and all relevant record documents, it is hereby

**ORDERED**, that Plaintiffs' motions for judgment on the agency

*NON-CONFIDENTIAL DOCUMENT*

record in Case Nos. 1:25-cv-00029-MMB, 1:25-cv-00031-MMB, and

1:25-cv-00032-MMB are denied; and it is further

ORDERED, that each of the above-referenced cases be

terminated consistent with this Court's opinion.

SO ORDERED.

_____
HON. M. MILLER BAKER, JUDGE


Dated: _____, 2025
    New York, New York