**Slip Op. 26-107**

**UNITED STATES**
**COURT OF INTERNATIONAL TRADE**

**Court No. 25-00032**

SHRIMP COMMITTEE OF THE VIETNAM ASSOCIATION OF SEAFOOD EXPORTERS AND PRODUCERS,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

AD HOC SHRIMP TRADE ACTION COMMITTEE
and
AMERICAN SHRIMP PROCESSORS ASSOCIATION,

*Defendant-Intervenors*.

Before: M. Miller Baker, Judge

**OPINION**

[Sustaining the International Trade Commission's affirmative material-injury determination.]

Dated: September 4, 2026

*Matthew R. Nicely*, *Daniel M. Witkowski*, *Julia K. Eppard*, and *Paul S. Bettencourt*, Akin Gump Strauss

Hauer & Feld LLP, Washington, DC, on the briefs for Plaintiff.

*Margaret D. Macdonald*, General Counsel; *Karl von Schriltz*, Assistant General Counsel for Litigation; and *John D. Henderson*, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, Washington, DC, on the brief for Defendant.

*Nathaniel Maandig Rickard*, *Zachary J. Walker*, and *Anjelika D. Jani*, Picard Kentz & Rowe LLP, Washington, DC, on the brief for Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

*Roger B. Schagrin*, *Elizabeth J. Drake*, and *Nicholas C. Phillips*, Schagrin Associates, Washington, DC, on the brief for Defendant-Intervenor American Shrimp Processors Association.

*Baker*, Judge: A group of Vietnamese seafood producers and exporters challenges the International Trade Commission's determination that subsidized imports materially injured the U.S. shrimp industry. The organization attacks the agency's findings regarding underselling, the effects of imports, and the cause of domestic industry's declining performance. For the reasons discussed below, the court sustains the Commission's decision.

## I

To combat unfair trade practices, the Tariff Act of 1930, as amended, provides a mechanism for imposing remedial countervailing duties on imported merchandise subsidized by foreign governments. 19 U.S.C.

§ 1671(a). As a prerequisite to imposition of duties, the statute requires that the Department of Commerce must investigate whether a foreign government is providing a subsidy and the International Trade Commission must examine whether a domestic industry is "materially injured . . . by reason of imports of that merchandise." *Id.* If both agencies find in the affirmative, Commerce imposes a duty "equal to the amount of the net countervailable subsidy." *Id.*

"The term 'material injury' means harm which is not inconsequential, immaterial, or unimportant." *Id.* § 1677(7)(A). The statute directs the Commission to consider the volume of imports of subject merchandise; the effect those imports have on U.S. pricing for domestic like products; and the impact of such imports on U.S. producers of domestic like products. *Id.* § 1677(7)(B)(i)(I)–(III).

For each of those three factors, the statute enumerates corresponding criteria the agency must also examine. *Id.* § 1677(7)(C)(i)–(iii). As relevant here, as part of its evaluation of foreign goods' effect on U.S. prices, the Commission must consider whether "there has been significant price underselling[1] by the imported merchandise as compared with the price of domestic like products." *Id.* § 1677(7)(C)(ii)(I). It must also investigate the extent to which the imports either significantly depress prices or prevent price increases

---

[1] "Undersell" means to "[s]ell at a lower price than (another person); cut out (another seller) by selling at a lower rate." 2 *Shorter Oxford English Dictionary* 3431 (5th ed. 2002).

that would otherwise have occurred. *Id.* § 1677(7)(C)(ii)(II).

The statutory instruction that the Commission consider whether material injury is "by reason of imports," *id.* § 1677(7)(B)(ii), "requires, at the least, but-for causation." *Changzhou Trina Solar Energy Co. v. U.S. Int'l Trade Comm'n*, 879 F.3d 1377, 1381–82 (Fed. Cir. 2018). That means they must be a "substantial factor" in causing the harm. *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

Thus, the Commission need not "isolate the injury caused by unfair imports nor demonstrate that [they] are the principal cause of injury." *Swiff-Train Co. v. United States*, 793 F.3d 1355, 1363 (Fed. Cir. 2015) (cleaned up). Rather, its task is to "ensure that it is not attributing injury from other sources to the subject imports." *Trina*, 879 F.3d at 1382. The key is that "*how* the standard is best applied in particular circumstances may vary with the facts." *Id.* at 1383 (emphasis in original). It is "[t]he substance of the Commission's analysis, not the specific formulation employed, [that] determines whether [it] has adequately answered the question." *Id.*

II

This is one of a trilogy of cases in which foreign plaintiffs challenge the Commission's finding that subsidized imports from Ecuador, India, and Vietnam materially injured the domestic shrimp industry. The

period of investigation was January 1, 2021, to March 31, 2024. Appx001354.[2]

The Commission found that imports undersold domestically produced frozen shrimp two-thirds of the time. Appx001317. In the other third, the imports oversold the domestic product. *Id.* But the agency cited figures showing that by *volume*, the former accounted for 87.2 percent of reported sales while the latter accounted for 12.8 percent. *Id.*

The Commission then observed that half of the ten responding shrimp purchasers said they had bought imports instead of domestic shrimp during the period of investigation, and of those, eight stated that the imports were cheaper. Seven of those eight, in turn, cited price as a primary reason for their purchasing decisions. Appx001318.

The agency concluded that "cumulated subject imports significantly undersold the domestic like product during the" period of investigation. Appx001320. It based this on "the pervasive subject import underselling" and "the substantial volume of confirmed lost sales." *Id*. It also pointed to "the importance of price in purchasing decisions" and "the at least moderate degree of substitutability" between wild-caught domestic shrimp and farm-raised imports. *Id*.

---

[2] A domestic trade group, the American Shrimp Processing Association, filed the agency petitions in 2023, supported by two other U.S. trade associations, the Ad Hoc Shrimp Trade Action Committee and the U.S. Shrimpers Coalition. Appx001265.

The Commission found, in turn, that the underselling "led to significant lost sales by the domestic industry and a shift in market share from the domestic industry to cumulated subject imports between 2021 and 2023." *Id.* It cited record data showing that subject imports gained market share during those years, "partially at the expense of the domestic industry," which in turn lost 0.8 percentage points of share to subject imports. *Id.* "This market share loss was equivalent to over 10 percent of the domestic industry's 7.6 percent market share in 2021." *Id.*

The agency stated that it was unpersuaded that asserted "attenuated" competition between farm-raised imports and wild-caught U.S. shrimp demonstrated an absence of underselling. Appx001320–001321. It acknowledged record evidence that "some responding purchasers" stated that the two types "have limited interchangeability" and that most responding U.S. importers said they are never interchangeable. Appx001321. But it observed that most U.S. processors who responded said the opposite—that the two are always interchangeable. *Id.*

Given this disparity in opinions, the agency looked at other record evidence and found that frozen shrimp "is frequently marketed and sold in ways that downplay the distinctions between domestic wild-caught shrimp and imported farm-raised shrimp, which inhibits purchasing decisions on that basis and elevates distinctions in prices." *Id.* The Commission found that retailers and consumers often "simply request shrimp without regard to its origin" and do not know whether they are purchasing wild-caught or farm-raised, which

"indicates that there is interchangeability between the two." *Id.*

It also cited evidence that "a majority of responding purchasers reported that they and their customers never or only sometimes make purchasing decisions based on the country of origin." *Id.* Most purchasers stated that the domestic and imported shrimp were comparable in several ways, which the agency interpreted as meaning that they are "at least moderately substitutable" such that price functions as a tie-breaker. Appx001321–001322. The agency concluded that the foreign exporters' claim of "attenuated competition" was "inconsistent with" the responses from 50 percent of the purchasers who said they bought imports instead of domestic shrimp during the period of investigation and with "the significant volume of confirmed lost sales in these investigations." Appx001322. It thus declined to find that competition was attenuated "based on the distinction between farm-raised and wild shrimp." *Id.*

III

Invoking subject-matter jurisdiction conferred on the court by 28 U.S.C. § 1581(c), the Shrimp Committee of the Vietnam Association of Seafood Exporters and Producers[3] brings this suit under 19 U.S.C. § 1516a(a)(2)(B)(i). Two of the three domestic industry groups—the Association and the Committee—inter-

---

[3] It describes itself as "a trade association of which a majority of its members are producers or exporters of subject merchandise." ECF 8, ¶ 3.

vened to support the agency decision. The parties have fully briefed the plaintiffs' Rule 56.2 motion for judgment on the agency record, which is ripe for disposition.

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits the Commission's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if the agency makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The substantial-evidence standard of review is not exclusive—that is, it does not require that there be one definitive answer. "Where two different, inconsistent conclusions may reasonably be drawn from the evidence in [the] record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013) (brackets omitted).

The court also reviews to ensure the agency engaged in "reasoned decisionmaking," meaning its result must be "within the scope" of its authority and "the process" it uses to reach that outcome "must be logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). The agency must "examine the relevant data and articulate a satisfactory explanation . . . including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). But courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

IV

A

1

The exporters claim that the Commission's lost-sales finding is deficient because it did not address the

first quarter of 2024.[4] They argue that domestic industry's market share rose during this period. ECF 67, at 28–29.

But the Commission did acknowledge that "domestic industry's share of apparent U.S. consumption . . . *was higher in interim 2024*, at 6.7 percent, compared with 5.4 percent in interim 2023." Appx001308 (emphasis added). Even so, that percentage was still lower than domestic industry's share at the beginning of the period of investigation ("7.6 percent"). *See id.*

The Vietnamese respondents then argue, citing a string of dictionary definitions, that "the Commission impermissibly read the word 'significant' out of the statute" because of what they call "the domestic industry's exceedingly small change in U.S. market share." ECF 67, at 31–33. They admit that the statute does not define any numerical threshold for what "significant" means, but they contend that "the term is an express statutory limitation that must be given meaning." *Id.* at 31. They argue that under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402 (2024), this court is "empowered to read every word in the statute and find that the change in the domestic industry's market share was not significant." ECF 67, at 32.

What is "significant," however, "is necessarily a fact-bound determination left to the agency's discretion." *OCP S.A. v. United States*, Slip Op. 26-75, at 22, 2026 WL 2269141, at *8 (CIT 2026); *cf. Coal. of Am.*

---

[4] The agency and the litigants refer to this period as "interim 2024."

*Mfrs. of Mobile Access Equip. v. United States*, Slip Op. 24-66, at 11, 2024 WL 2796654, at *4 (CIT 2024) ("[W]hat is reasonable depends on the context.") (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)). "And while courts decide what the law means, 'judicial review of agency . . . factfinding [is] deferential.'" *OCP*, Slip Op. 26-75, at 22, 2026 WL 2269141, at *8 (alterations in original) (quoting *Loper Bright*, 603 U.S. at 392).

Here, the Commission found that domestic industry's loss of 0.8 percentage points of market share to imports between 2021 and 2023 "was equivalent to over 10 percent of the domestic industry's 7.6 percent market share in 2021." Appx001320. That is a reasonable explanation for why the agency found the lost market share "significant."

The exporters also object to the Commission's consideration of combined market share for fresh and frozen shrimp. ECF 67, at 29–31. They argue that because subject imports were frozen shrimp, which does not compete with fresh shrimp, the former "did not complete directly with the U.S. fresh shrimp industry." *Id*. at 31. "Therefore," they contend, "the Commission should not have relied on changes to the U.S. market share for fresh shrimp to determine the price effects of subject imports of frozen shrimp." *Id*.

But as the Commission points out, the exporters did not object to either the agency's inclusion of fresh shrimp within "domestic like product" or fishermen within "domestic industry." ECF 70, at 49–50. They have thus failed to exhaust their administrative

remedies by never raising this theory before the Commission. *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013).

In any event, the statute directs the agency to consider the effect of subject imports on the domestic industry "*as a whole*." 19 U.S.C. § 1677(4)(A) (emphasis added). That's what the Commission did when it included fresh shrimp in its calculation of lost market share.

Finally, the exporters fail to identify what prejudice, if any, they suffered by this inclusion. If anything, it *helped* them, because the market share of domestically caught fresh shrimp increased between 2021–2023. *See* Appx001117. Thus, as the Commission observes, if it had "focus[ed] only on the market share of U.S. processors," the loss would have been even "*higher*." ECF 70, at 51 (emphasis in original). So any (hypothetical) error by the agency was harmless.

2

The Vietnamese exporters also attack the Commission's finding that underselling caused domestic industry to lose market share. They object that although the agency found that imports took sales and depressed prices, "[p]rice trends during the [period of investigation] were not positively correlated with changes in the domestic industry's market share." ECF 67, at 33–34. The exporters observe that the agency acknowledged that while domestic industry lost share in 2021 and 2022, import prices increased. *Id.* at 34 (citing Appx001325). They also point out that

U.S. producers *gained* market share from 2022 to 2023 and in interim 2024, the periods when the Commission found domestic prices to be depressed by imports. *Id.* (citing Appx001226, Appx001228).

But the agency acknowledged the early price increases, stating that "[i]n general, prices decreased over the [period of investigation], with an increase in 2021 and the first half of 2022 and then a decrease thereafter." Appx001325. It found that as an overall matter, while both domestic industry and the imports saw price decreases over the full 2021–2023 period,[5] the domestic product saw sharper decreases. Appx001325–001326. The fishermen saw their average unit values per pound decline each year. Appx001326. And regarding market share, while the pages the Vietnamese exporters cite do show an increase in domestic industry's share in the later part of the period of investigation, the increase was of a considerably lesser magnitude than the decrease in the earlier portion. *See* Appx001226. And the value of net sales continued to decrease throughout the entire period. *See* Appx001228.

The exporters' theory appears to be that the agency cannot evaluate the overall trend and must instead consider the data year-by-year, or perhaps quarter-by-quarter. But they cite no authority establishing such a requirement. The court therefore construes their

---

[5] The Commission explained that it considered pricing data for interim 2024 but chose to focus on 2021–2023 because the U.S. fishermen "were not asked to submit data for interim 2024." Appx001325 n.227.

argument as a quarrel with how the Commission weighed the evidence. That question, of course, is beyond the court's purview.[6]

* * *

The court sustains the Commission's findings as to loss of market share and underselling.

B

The Vietnamese exporters assert that the relevant law and substantial evidence do not support the agency's "determination that the domestic industry experienced a significant negative impact from subject imports." ECF 67, at 3. They contend that the Commission relied on "isolated tidbits of data" that "no reasonable mind would consider" adequate. *Id.* at 39. And they assert that the agency read "the critical term 'material' out of the statute."[7] *Id.*

---

[6] The Vietnamese exporters also argue at length that the record does not support a finding of price suppression. *See* ECF 67, at 36–38. This is a strawman, as the Commission made no such finding. And it didn't need to. In evaluating price effects, the statute only required the agency to "consider"—in addition to whether there has been underselling, *see* 19 U.S.C. § 1677(7)(C)(ii)(I)–whether imports "otherwise depress[ ] prices to a significant degree *or* prevent price increases," *id.* § 1677(7)(C)(ii)(II) (emphasis added)—i.e., suppress prices. Here, the Commission considered both as required, *see* Appx001325, but found only the former, *id.*

[7] The court rejects the exporters' argument concerning "material" for the same reason it dismissed their theory regarding "significant." Whether something satisfies the

(footnote continues on next page)

The exporters initially reprise their argument as to underselling and lost sales, contending that the Commission "ignored data for interim 2024" and that the percentage-point change was too small to be "significant." *Id.* at 40. Those arguments are meritless for the reasons discussed above.

Then they accuse the agency of ignoring evidence in the record and instead "present[ing] certain cherry-picked indicators as evidence that the domestic industry was injured by subject imports."[8] ECF 67, at 42 (citing Appx001333–001339). But rather than pointing to any such overlooked evidence, the exporters simply repeat their allegation of cherry-picking. *Id.*

The so-called "cherry-picked" pages in the Commission's decision contain extensive discussion of the economic performance of both segments of the domestic industry (fishermen and processors). *See* Appx001333–001339. The exporters do not address most of it nor explain why they believe the agency's

---

definition of either word depends on context. That in turn requires a factual finding, which is a matter of agency discretion.

[8] They also complain, again, about the Commission "ignor[ing] data for interim 2024." ECF 67, at 40. On the pages the exporters cite, however, the agency discussed interim 2024 data with respect to the domestic processors. *See* Appx001335–001338. While it did not do so for the fishermen, *see* Appx001333–001334, it again reiterated that it "did not collect interim data from [them] to reduce the burden on these mostly small enterprises in responding to the Commission's questionnaire." Appx001333 n.259. The exporters have raised no objection to that decision.

treatment of it is wrong. *Cf*. 28 U.S.C. § 2639(a)(1) (providing that in cases brought under 19 U.S.C. § 1516a, the Commission's decision "is presumed to be correct" and the party challenging it has "[t]he burden of proving otherwise").

To be sure, they do mention that "the domestic industry's capital expenditures increased by 26.1 percent from 2021 to 2023." ECF 67, at 41. The Commission took note of that fact. *See* Appx001338, Appx001348–001349. It addressed it in the context of an argument made by the Ecuadorian plaintiffs regarding whether the domestic industry made sufficient investments to compete with imports. It found that "a substantial number" of U.S. processors reported that they could not make nearly as many capital investments as they wished because of competition from cheaper imports. Appx001348–001349.

And while the exporters accuse the Commission of failing to "engage with the domestic industry's performance indicators . . . in the context of declining demand," ECF 67, at 42, the agency stated that it was "unpersuaded by respondents' argument that any injury to the domestic industry can be explained by falling U.S. demand between 2021 and 2023," Appx001343. It cited the 13.6-percent decline in apparent consumption and observed that processors' production and shipments, the domestic industry's net sales average unit values and shipment values, and the U.S. fishermen's sales values all declined by greater percentages than the one for consumption. Appx001344. The exporters, in turn, argue that the domestic industry's "gross profit, net income, capacity

utilization, number of production-related workers, hours worked, and wages paid declined by less than apparent U.S. consumption." ECF 67, at 41. But the Commission nevertheless found that those indicators *still declined*. Appx001337–001338.

Thus, the Vietnamese exporters' argument is merely a weight-of-the-evidence dispute. The Commission did not "ignore" evidence in the way they contend—it simply found other evidence more compelling. That is an agency's prerogative as long as it explains itself, which was the case here.

C

The final error the Vietnamese plaintiffs assert involves the Commission's attribution of the decline in domestic industry's performance to imports. ECF 67, at 3–4.

1

Observing that "[n]early all imports were farm-raised shrimp and nearly all domestic like product was wild-caught," the Vietnamese exporters call the Commission's conclusion that farm-raised and wild-caught shrimp are interchangeable "central" to its "finding of significant negative impact on the domestic industry 'by reason of' subject imports." ECF 67, at 49 (citing Appx001304, Appx001307, Appx001321).

They then cite four agency findings they contend are not supported by substantial evidence. First, they point to its conclusion that some purchasers and importers stated the two types have limited inter-

changeability and that a majority of domestic processors said they are always interchangeable. *Id.* (citing Appx001321). Second, they dispute its finding that frozen shrimp is often marketed and sold to downplay differences in origin such that retailers and consumers often don't know whether they're buying wild-caught or farm-raised. *Id.* at 49–50 (citing Appx001321). Third, they quibble with the agency's citation of questionnaire data showing that U.S. customers do not consider country of origin when buying. *Id.* at 50 (citing Appx001321). And fourth, they disagree with what they describe as its finding that "because questionnaire response data indicate that wild-caught and farm-raised shrimp have similar levels of quality, consistency, and count size, the two market segments must necessarily compete against each other." *Id.* (citing Appx001321–001322).

*Interchangeability*. The exporters assert that "the Commission's characterization of the questionnaire data that 'some' U.S. importers and purchasers reported 'limited interchangeability' is inconsistent with the record." *Id.* (quoting Appx001296, Appx001321). They object that majorities of both U.S. importers and retailer, restaurant, and food-processor purchasers stated that the two types are never interchangeable, that a plurality of U.S. distributors or wholesalers agreed, and that "overwhelming majorities" of respondents "always or sometimes" distinguished between the two types. *Id.* at 50–51 (citing Appx001041).

None of that argument, however, takes away from the Commission's conclusion that "some" respondents said there was limited interchangeability. The agency

acknowledged the contrary responses in the record and observed that "a majority of responding U.S. *processors* reported that farm-raised and wild-caught shrimp are *always* interchangeable." Appx001321 (emphasis added) (citing the table on Appx001041). The table the agency cited shows that 18 of 21 U.S. processors said the two types are either "always" or "usually" interchangeable. Appx001041. Of importers, 20 of 46 answered "usually" or "sometimes." *Id.* And the text below that table says, "Purchasers generally reported that wild-caught and farm-raised shrimp had limited interchangeability." *Id.* That is consistent with the Commission's statement that "*some* responding purchasers and importers" said just that.[9] Appx001321 (emphasis added).

At bottom, the exporters' quarrel with the Commission over the interchangeability of farm-raised and wild-caught shrimp is just (yet another) disagreement over the weight to be assigned the various parts of the record. The agency, not the court, is the factfinder, and it reasonably explained the basis for its conclusion that the two types are interchangeable.

*Marketing.* As noted above, the agency found it important that "the record indicates that frozen warmwater shrimp is frequently marketed and sold in ways that downplay the distinctions between" domestic wild-caught and imported farm-raised shrimp, "which

---

[9] For example, while 7 of 12 retailer or restaurant buyers said customers "always" distinguish between the two types, that left 4 who answered "sometimes." *Id.* In other words, there is a difference between "a majority" and "some."

inhibits purchasing decisions on that basis and elevates distinctions in prices." Appx001321. It found that "retailers and consumers often do not know whether they have purchased wild-caught shrimp or farm-raised shrimp, and simply request shrimp without regard to its origin." *Id.*

The Vietnamese exporters object that while "[t]he Commission cited testimony, a photograph of a single package of frozen shrimp, and news articles provided by U.S. processors to support its conclusion," ECF 67, at 52 (citing Appx001321), its "conclusion is inconsistent with overwhelming record evidence," *id.* at 53. They argue that the agency's finding is "inconsistent" with domestic purchasers' questionnaire responses showing that "large majorities" of every category of U.S. purchaser consider the two types of shrimp "to sometimes or never be interchangeable." *Id.* (citing Appx001321, Appx001041). They accuse the Commission of failing to address "that 19 of 20 purchasers reported that the availability of farm-raised shrimp is very or somewhat important." *Id.* (citing Appx1040).

The exporters also contend that the agency ignored testimony from three retailer representatives whose companies distinguish between wild-caught and farm-raised shrimp. ECF 67, at 54 (citing Appx55267, Appx58422–58423, and Appx001038). "Despite the significant probative value of this information," they argue, "the Commission did not include a single reference to this testimony or U.S. purchaser questionnaire responses, instead relying on U.S. processors' testimony to determine U.S. retailers' ability to distinguish

between farm-raised and wild-caught shrimp." *Id.* (citing the same pages).

But on the other hand, the agency didn't say that purchasers *never* know what they're buying. It found that they "often do not know," that they request shrimp without regard to its origin, and that "they and their customers never or only sometimes make purchasing decisions based on the country of origin." Appx001321 (citing Appx001038). It also cited other testimony from domestic processors who stated that distributor and retailer customers actively discourage them from labeling their shrimp as domestic or from trying to position wild-caught shrimp as a "premium product," with the result being that the customers do not know which type they are buying. Appx001311–001312 (citing Appx58297–58298, Appx58356). And it noted evidence about restaurants and grocery stores marketing imported farm-raised shrimp in ways suggesting it was wild-caught. Appx001323 (citing those same pages).

The Commission argues that it simply weighed the evidence differently than the exporters. ECF 70, at 85. The court agrees. While the plaintiffs seem to contend that the record evidence can support only one reading, substantial-evidence review allows for incongruent inferences. *See Morsa*, 713 F.3d at 109 (recognizing the possibility that "two different, inconsistent conclusions may reasonably be drawn from the evidence" and holding that in such cases the agency has discretion to choose between them); *cf.* F. Scott Fitzgerald, *The Crack-Up* 69 (Edmund Wilson ed., 1945) ("[T]he test of a first-rate intelligence is the ability to hold two

opposed ideas in the mind at the same time, and still retain the ability to function.").

*Country of origin.* The Vietnamese exporters assert that "the Commission's reliance on U.S. purchaser questionnaire responses regarding preference for country of origin to draw conclusions regarding the interchangeability of wild-caught and farm-raised shrimp is not supported by substantial evidence" because the agency "did not explain how these responses relate to" that issue. ECF 67, at 55 (citing Appx001321).

But the exporters admit that "[n]early all imports were farm-raised shrimp and nearly all domestic like product was wild-caught shrimp."[10] *Id.* at 49 (citing Appx001304, Appx001307). In light of that fact, it's apparent that the agency reasonably treated foreign origin as a proxy for farm-raised shrimp.[11] For

---

[10] The agency treated the exact percentages as confidential. Suffice it to say that the words "nearly all" are an understatement.

[11] The Vietnamese exporters respond that "country-of-origin preference is not a proxy for production setting because a majority of purchasers indicated that farm-raised and wild-caught shrimp are not interchangeable, while many of those same purchasers expressed no preference for country of origin." ECF 54, at 23. They weigh the evidence as meaning that buyers do not care about the country of origin for farm-raised shrimp, as opposed to not caring about the issue overall. *Id.* But it is apparent that the Commission weighed it differently. Consistent with its evaluation of the "interchangeability" issue, that was its prerogative.

example, it explained "[t]hat retailers and consumers often do not know whether they have purchased wild-caught . . . or farm-raised shrimp, and simply request [it] without regard to its origin." Appx001321. As the agency notes, "[a]ny purchaser with a preference for wild-caught shrimp would have reported purchasing . . . based on country of origin, as such shrimp is only available from the United States." ECF 70, at 86. "In this case, the agency's path is clear, even though it did not set forth its conclusion . . . explicitly." *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005).

*"Necessarily compete."* While the Vietnamese exporters characterize the fourth alleged error as involving the Commission's drawing a conclusion that wild-caught and farm-raised shrimp "must necessarily compete against each other" based on questionnaire responses, ECF 67, at 50 (citing Appx001321–001322), their actual argument is just a repackaging of their "interchangeability" theory. They assert that the agency "did not explain why comparable 'product consistency, quality meets industry standards, quality exceeds industry standards, and count size' supports its conclusion regarding interchangeability, where purchasers have different standards for wild-caught and farm-raised shrimp." *Id.* at 57 (citing Appx001321–001322, Appx001038, Appx58422–58423). The exporters cite a Costco representative's testimony that his company holds farmed shrimp to higher standards than wild-caught shrimp. *Id.* (citing Appx58422–58423). They also accuse the agency of ignoring another company's questionnaire response. *Id.*

The Commission, on the other hand, stated that "majorities or pluralities of responding purchasers" found the domestic and imported shrimp comparable in the categories listed. Appx001321–001322 (citing Appx001045–001049). The exporters argue, in essence, that evidence from two companies (large businesses, to be sure) necessarily outweighs submissions from other shrimp buyers. The agency referred to "the responses from half of the responding purchasers confirming that they bought subject imports instead of domestically produced" frozen shrimp during the period of investigation. Appx001322 (citing Appx001145). It is plain from the Commission's discussion that it gave greater weight to the majority of the respondents' answers. Once again, that exercise of discretion falls comfortably within the agency's wheelhouse.

2

The Vietnamese exporters charge that "the Commission failed to collect questionnaire response data that would elicit record evidence of alternative causes of decreased domestic industry market share." ECF 67, at 59 (section heading). They claim the agency "was forced to draw conclusions based on inadequate information" because it did not adopt revisions some parties suggested. *Id.* They argue that, had the Commission asked additional questions, "there would have been data on the record for [it] to assess the level of attenuated competition between foreign and domestic merchandise." *Id.* at 61.

Specifically, the plaintiffs assert that the agency "did not revise" the purchaser questionnaire to ask

about "raw material (farmed or wild-caught shrimp), freezing type (IQF, block, or other), availability of cooked shrimp, [and] count size," all of which they identify as "examples of non-price factors that were important to purchasers." *Id.* (citing Appx57187). But the Commission responds that it included those factors *twice* in separate questions, ECF 70, at 102 (citing the second through eighth factors on both Appx57282 and Appx57288), and the record confirms the accuracy of that statement.

The exporters nevertheless insist "the Commission was unable to conduct its statutory analysis." ECF 54, at 27. But their only arguments consist of assertions about what *they believe* the answers to the proposed questions would have shown. *See* ECF 60, at 61 (speculating, without actual evidence, that revising questionnaires would have shown that "non-price factors" were important to purchasers and that asking about additional varieties of shrimp "would have demonstrated the domestic industry's limited ability to supply the varieties demanded by U.S. purchasers"); ECF 54, at 27 (claiming, again without evidence, that "the proposed additions to purchaser questionnaires would have provided much-needed clarity").

"It should be obvious that the court cannot overturn an agency decision based on a party's speculative complaints." *Am. Pac. Plywood, Inc. v. United States*, Slip Op. 23-93, at 44, 2023 WL 4288346, at *14 (CIT 2023). As the agency correctly notes, "a decision not to collect additional information does not alone render the Commission's final determination unsupported by substantial evidence." ECF 70, at 107 (quoting *Full Member*

*Subgrp. of Am. Inst. of Steel Constr., LLC v. United States*, 81 F.4th 1242, 1257 (Fed. Cir. 2023)).

"There is no statutorily designated minimum standard that requires a particular degree of thoroughness in [its] investigation." 81 F.4th at 1257 (brackets omitted). And while the exporters argue that the Commission "has not demonstrated that it collected the information required to fulfill its statutory requirements," ECF 54, at 25 (heading, title case removed), the agency does not have the burden of doing so. *See* 28 U.S.C. § 2639(a)(1) (assigning the party challenging the agency decision with the burden of proving that it was incorrect).

* * *

For the foregoing reasons, the court sustains the Commission's material-injury determination. A separate judgment will issue. *See* USCIT R. 58(a).

Dated: September 4, 2026   /s/ *M. Miller Baker*
New York, NY   Judge